## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| MICHELLE MACDONALD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BREWER SCHOOL DEPARTMENT, | ) |
| and | ) |
| GREGG PALMER, individually, and in his | ) |
| official capacity; | ) |
| and | ) |
| CHERI TOWLE, individually, and in | ) |
| her official capacity; | ) |
| and | ) |
| BRENT SLOWIKOWSKI, individually, and in | ) |
| his official capacity; | )     **COMPLAINT** |
| and | ) |
| RENITA WARD-DOWNER, individually, and in | ) |
| her official capacity; | ) |
| and | ) |
| PAUL WELLMAN, individually, and in his | ) |
| official capacity; | ) |
| and | ) |
| BREANNE PELLETIER, individually, and in | ) |
| her official capacity, | ) |
| | ) |
| Defendants | ) |
| | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL
## INJUNCTIVE RELIEF SOUGHT

Plaintiff, Michelle MacDonald, hereby complains against Defendants, Brewer School

Department, Gregg Palmer, Cheri Towle, Brent Slowikowski, Renita Ward-Downer, Paul

Wellman, and Breanne Pelletier, as follows:

**INTRODUCTION**

1)      This complaint is brought by a high school English teacher who has suffered a campaign of harassment and was stripped of her department leadership role because she is associated with and has advocated for the rights of LGBTQ+ students.

2)      When she complained about that retaliation to her school administrators, instead of addressing it appropriately so that it would stop, they minimized it and blamed her.

3)      The Maine Human Rights Commission saw it differently. After a nearly two-year investigation, the Commission found reasonable grounds to believe that unlawful discrimination and retaliation occurred.

4)      The action seeks to redress that unlawful discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the Civil Rights Act of 1991, 42 U.S.C. § 1981a; the First Amendment to the United States Constitution ("First Amendment"); the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution ("Equal Protection"); 42 U.S.C. § 1983; the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 et seq.; and the Maine Whistleblowers' Protection Act, 26 M.R.S. §§ 831 et seq. ("WPA").

**JURISDICTION**

5)      This court has proper subject matter jurisdiction over MacDonald's federal claims under 28 U.S.C. § 1331, Title VII, 42 U.S.C. § 1983, the First Amendment, and the Equal Protection clause.

6)      This court has proper supplemental jurisdiction over the MacDonald's state law claims under 28 U.S.C. § 1367(a).

2

7)     This action properly lies in the District of Maine under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district.

8)     This action is properly filed and shall be tried in Bangor because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in Penobscot County, Maine.

## PARTIES

9)     Plaintiff Michelle MacDonald is a citizen of the United States and the State of Maine who resides in the Town of Hampden, County of Penobscot, State of Maine.

10)     Throughout the events giving rise to this complaint MacDonald has been employed by the Brewer School Department as an English teacher at Brewer High School in Brewer, Maine.

11)     Defendant Brewer School Department is a public school department operated by the City of Brewer, County of Penobscot, State of Maine.

12)     Brewer School Department operates Brewer High School in the City of Brewer, County of Penobscot, State of Maine.

13)     At all material times, the Brewer School Department employed more than 200 employees in each of 20 or more calendar weeks in each of the calendar years from 2017 through 2022.

14)     Defendant Gregg Palmer is an individual who resides in the Town of Levant, County of Penobscot, State of Maine.

15)     Since August 2019, Mr. Palmer has been employed by the Brewer School Department as the Superintendent.

16)     Defendant Cheri Towle is an individual who, based on information and belief, resides in the State of Maine.

17)     From October 2015 to July 2019, Ms. Towle was employed by the Brewer School Department as the Superintendent.

18)     Defendant Brent Slowikowski is an individual who resides in the City of Bangor, County of Penobscot, State of Maine.

19)     Throughout the events giving rise to this complaint, Mr. Slowikowski has been employed by the Brewer School Department as the Principal of Brewer High School.

20)     Defendant Renita Ward-Downer is an individual who resides in the Town of Newburgh, County of Penobscot, State of Maine.

21)     Throughout the events giving rise to this complaint, Ms. Ward-Downer was employed by the Brewer School Department as the Director of Instruction.

22)     Defendant Paul Wellman is an individual who, based on information and belief, resides in Michigan.

23)     At the times he is referenced herein, Mr. Wellman was employed by the Brewer School Department as an English teacher at Brewer High School.

24)     Defendant Breanne Pelletier is an individual who resides in the Town Orrington, County of Penobscot, State of Maine.

25)     Throughout the events giving rise to this complaint, Ms. Pelletier was employed by the Brewer School Department as an English Teacher at Brewer High School.

4

26)     This complaint is brought against the individual Defendants in their individual and official capacities.

27)     At all material times, the individual Defendants were acting under color of state law.

## ADMINISTRATIVE PROCEEDINGS

28)     On or about October 9, 2019, MacDonald filed an intake questionnaire with the Maine Human Rights Commission ("MHRC") and by virtue of their work-sharing agreement the Equal Employment Opportunity Commission ("EEOC") against Brewer School Department, Mr. Wellman, and Ms. Pelletier alleging wrongful conduct establishing associational sexual orientation, gender identity, and gender expression discrimination, WPA retaliation, and MHRA and Title VII retaliation.

29)     On October 29, 2019, MacDonald filed a complaint (hereinafter "First Complaint") under oath with the MHRC against Brewer School Department, Mr. Wellman, and Ms. Pelletier alleging wrongful conduct establishing associational sexual orientation, gender identity, and gender expression discrimination, WPA retaliation, and MHRA and Title VII retaliation.

30)     The First Complaint was simultaneously dual filed with the EEOC

31)     On March 4, 2020, MacDonald amended her First Complaint to clarify and amplify the allegations therein.

32)     On April 1, 2021, MacDonald filed an intake questionnaire with the MHRC against Brewer School Department and Ms. Pelletier alleging wrongful conduct establishing continued associational sexual orientation, gender identity, and gender expression discrimination; WPA retaliation; MHRA and Title VII retaliation discrimination; and retaliation for filing her First Complaint and its amendment.

33)     On June 11, 2021, MacDonald filed a complaint under oath with the MHRC against Brewer School Department and Ms. Pelletier (hereinafter "Second Complaint") alleging wrongful conduct establishing continued associational sexual orientation, gender identity, and gender expression discrimination; WPA retaliation; MHRA and Title VII retaliation discrimination; and retaliation for filing her First Complaint and its amendment.

34)     The Second Complaint was simultaneously duel filed with the EEOC.

35)     On July 23, 2021, the MHRC found reasonable grounds on the First Complaint to believe that the Brewer School Department discriminated against MacDonald because of association on the basis of sexual orientation and/or gender identity/expression; and reasonable grounds to believe that the Brewer School Department retaliated against MacDonald for engaging in MHRA-protected activity.

36)     On July 23, 2021, the MHRC dismissed the First Complaint against Mr. Wellman and Ms. Pelletier under 5 M.R.S. § 4612(2).

37)     On November 1, 2021, the MHRC issued MacDonald a letter stating that conciliation had been unsuccessful on the First Complaint and informing her that she had the right to file a civil action within two years after the act of alleged discrimination complained of or within 90 days of the date of the MHRC's November 1st letter, whichever was later.

38)     On December 13, 2021, the MHRC dismissed the Second Complaint under 5 M.R.S. § 4612(2).

39)     On January 28, 2022, the EEOC issued Dismissal and Notice of Rights letters on the First and Second Complaints.

40)     All preconditions precedent required to obtain the full relief available under Title VII and the MHRA have been performed or have occurred.

## STATEMENT OF FACTS

41)     Michelle MacDonald has been employed as an English teacher at Brewer High School since 2007.

42)     MacDonald has received consistently strong performance evaluations and served for seven years as the Curriculum Leader (equivalent to a department chair) prior to the 2019-2020 school year.

43)     MacDonald has a minor transgender child who attends a different school system.

44)     MacDonald serves as the co-advisor of the School's Gender and Sexuality Alliance ("GSA") and is well known for her advocacy on behalf of LGBTQ+ students.

45)     She has had many discussions with The Brewer School Department to ask for more training for staff, presentations for students, and for other steps to help create and maintain a safe and supportive environment for LGBTQ+ students.

46)     Wellman and Pelletier are also English teachers at the high school.

47)     MacDonald got along well with Wellman and Pelletier until 2017.

48)     On January 20, 2017, MacDonald met with Superintendent Towle along with her former co-adviser for the GSA to discuss concerns of hostility directed towards transgender students. For example, transgender students reported that some teachers were using their "deadnames" and former pronouns instead of their correct names and pronouns.

49)     MacDonald and her co-adviser explained the harm that occurs upon misgendering transgender students and that students have a legal right to be recognized by their preferred or

7

stated gender identity at school, even if their parents do not recognize the students' correct
gender.

50)     Dr. Towle stated that it could not be true that students in younger grades had the right
to go by their preferred gender because the students could "change their mind."

51)     MacDonald tried to personalize the conversation by bringing up her own experience
with her young child and that the Brewer School Department needed to support all students of all
ages.  Towle responded, "even at seven?"

52)     Dr. Towle appeared uncomfortable and defensive with the conversation.

53)     In March 2017, MacDonald was approached by students concerned about the GSA
being excluded from the yearbook. The students had heard other clubs being called over the
loudspeaker to have their yearbook photos taken but not those in the GSA.

54)     MacDonald addressed the issue for the students by contacting Pelletier, who served as
the yearbook advisor and decided which clubs were included in the yearbook.

55)     Pelletier told MacDonald that the GSA would not be in the yearbook because it was a
"support group" and did not do "anything worth taking pictures of."

56)     MacDonald reported the issue to The Brewer School Department, and Pelletier was
told that the yearbook must include GSA.

57)     After this incident Pelletier began treating MacDonald in a hostile manner. For
example, she gave her dirty looks, called her "drama queen," stopped responding to her emails,
spoke negatively about her to students, and was rude and hostile to her in meetings.

58)     In June 2017, MacDonald requested that the GSA advisor position be a paid stipend
position consistent with other club advisors at the school. She noted that GSA had been without a

paid stipend position for its club advisor for four or five years, while it typically only took a year for a new club to get a stipend position.

59)     On September 17, 2017, MacDonald reported to Principal Slowikowski that a colleague had expressed that the GSA advisor position should not be paid because it was "like a religion" similar to the Fellowship of Christian Athletes and that MacDonald was "influencing students with [her] beliefs."

60)     She reported that the colleague felt the GSA advisor position was an adult pushing her beliefs on students.

61)     The colleague MacDonald reported was Wellman, whose hostile views about LGBTQ+ rights were well-known. He had also told MacDonald that he viewed people in the LGBTQ+ community as "unnatural" and as "mutation[s] of nature."

62)     MacDonald requested that Principal Slowikowski implement more training for staff in LGBTQ+ rights and awareness.

63)     On October 6, 2017, MacDonald stopped by Wellman's classroom to discuss a personal writing project. During the conversation, Wellman asked MacDonald if she knew of any articles with statistics on transgender people making disproportionately low wages and that he wanted to do a lesson on pay inequality.

64)     MacDonald informed Wellman that she would be happy to look for articles but cautioned him against "debating" LGBTQ+ issues in the classroom because there had been recent incidents of students making disparaging comments, and it could open up the opportunity for kids to say things that made their nonbinary and transgender peers feel unsafe in the classroom.

65)     In fact, MacDonald was concerned about these types of debates in Wellman's classroom because she had heard reports from students about Wellman allowing and encouraging students to openly debate the topic of transgender identity and gay marriage in class.

66)     As the conversation became heated, Principal Slowikowski arrived and began moderating the discussion.

67)     MacDonald emphasized that the School was open to legal risk if it failed to provide a safe learning environment for LGBTQ+ students and that a student had recently removed from Wellman's classroom to MacDonald's because the student recently came out and was uncomfortable with Mr. Wellman in light of his known opposition to LGBTQ+ rights.

68)     MacDonald told Slowikowski they were not protecting their teachers if they were not training them on how to properly handle LGBTQ+ issues.

69)     MacDonald additionally said that comments made by Wellman had made her feel uncomfortable because of her transgender child.

70)     At some later point, Slowikowski told MacDonald that she was "too close to the issue" because of her transgender son.

71)     On December 15, 2017, Slowikowski and the assistant principal were invited to a GSA meeting by the students. The students shared their concerns and ideas on how to create a safe environment for students at the school. Students specifically addressed how they felt LGBTQ+ slurs were not treated with the same level of severity as racial slurs.

72)     Slowikowski responded that each teacher would respond to a word like "fag" differently, and he could not control that response. MacDonald disagreed and stated that "fag" is derogatory hate speech that should be dealt with the same way as a racial slur.

10

73)     On January 17, 2018, MacDonald informed Principal Slowikowski that Pelletier was refusing to respond to her work-related emails. Pelletier's conduct appeared to be in retaliation for MacDonald's opposition to Pelletier excluding GSA from the yearbook.

74)     In early February 2018, MacDonald again requested that LGBTQ+ training be scheduled for The Brewer School Department's staff. Slowikowski stated that training could be scheduled as one of several options for teacher training on a Professional Development Day. MacDonald objected and asked that the training be scheduled on a day when all staff would be trained. Slowikowski replied that it was offensive to suggest the school was not doing enough.

75)     In February 2018, the GSA was hosting a guest speaker on LGBTQ+ safety in schools. On February 28, 2018, Wellman asked MacDonald if he could send students to the presentation in order to analyze the speaker's persuasive rhetoric.

76)     Emails written by a student in Wellman's class from November 2015 and February 2016 show the student discussed events in class that were upsetting to her and made her feel unsafe. Specifically, in November 2015 the student wrote: "What you said yesterday in class about [a female celebrity who was transgender] still being a man was very rude and disrespectful. I have at least two friends who are transgender, and it made me very upset when you were implying that somebody else could tell them who they are and who they're supposed to be. Also what you said about t-rexes and transgender was like equating homosexuality and bestiality."

77)     In February 2016, the student wrote that Wellman upset her when he "made a comment about gay marriage being disgusting in class."

78)     On March 15, 2018, Slowikowski came to MacDonald's room and said he wanted to have a meeting with her, the assistant principal, and Pelletier about an issue with GSA and the yearbook. He stated the meeting would take place immediately and brought in the assistant principal and Pelletier who were waiting in the hall.

79)     The assistant principal stated there was an issue with GSA photos in the yearbook and that the yearbook student in charge of taking the photos was upset because she felt she could not get the photos she needed. Pelletier stated one of the issues was that MacDonald had told the student she could not take pictures at one of the GSA events.

80)     MacDonald responded that there had been no problems working with the student, their interactions had been positive, and she had only requested the student ask people permission before taking their photo. She also questioned why the co-advisor of the GSA was not present at the meeting.

81)     Previously, some of the students in the GSA had concerns for their safety if their parents found out they were a part of the GSA and did not want their faces to be shown. The GSA advisors had provided a list of suggestions for how the students could be photographed without their faces.

82)     During the meeting, Slowikowski and Pelletier stated they wanted the students' pictures in the yearbook. MacDonald emphasized student safety should always be top priority.

83)     MacDonald noted that Pelletier told students that MacDonald was the reason that GSA had to be in the yearbook, that it was inappropriate to be involving students in their exchanges, and that Pelletier had been hostile towards MacDonald since the original yearbook/GSA discussions.

12

84)     In fact, prior to the original discussion in March 2017, MacDonald and Pelletier had been able to resolve professional disagreements amicably.

85)     Pelletier stated repeatedly during this meeting that she did not like MacDonald and there was nothing MacDonald could do to change her mind.

86)     Neither Slowikowski nor the assistant principal did anything to stop or address Pelletier's statements.

87)     Slowikowski had not invited or given notice of this meeting to MacDonald's co-advisor of the GSA and did not provide MacDonald with a reason why when requested.

88)     MacDonald was very emotional at the conclusion of the meeting and that she felt ambushed.

89)     In April 2018, MacDonald filed an affirmative action complaint with The Brewer School Department, which alleged that she was being subjected to a hostile work environment. She mentioned multiple prior incidents, including the March meeting about the yearbook.

90)     In connection with settling a union grievance with MacDonald, the school agreed to hold an LGBTQ+ rights training for the staff, but school administration chose to hold the training on the afternoon of the last day of school in June 2018.

91)     Historically, teachers had been permitted to leave at 12:30 P.M. on the last day of school, but this day they were required to stay longer due to the training, causing resentment from teachers who were required to stay longer due to the training.

92)     On October 22, 2018, MacDonald accompanied a student to a meeting with the assistant principal in which the student made a complaint that another student used the word

"tranny" (a slur for a transgender person) in front of a teacher in one of his classes and the teacher did nothing about it.

93)     On November 20, 2018, MacDonald made a request to Superintendent Towle to have gender neutral bathrooms at the school as well as allow the students to meet during the high school's academic period. Towle responded that they were following the transgender bathroom policy and that the academic period needed to remain open for academic time.

94)     On November 26, 2018, MacDonald reported to the vice principal that a student had torn down one of the "Gender 101" posters hanging outside the guidance office while making a derogatory comment about the poster and stomping on it.

95)     On April 4, 2019, MacDonald emailed Principal Slowikowski to report that a student had responded aggressively to a creative writing prompt that include the pronoun "they." The student got up, yelled at MacDonald, and said he would call people whatever he wanted, "he, she, or it." Principal Slowikowski refused to tell the student that his behavior was unacceptable.

96)     Sometime in May 2019, a student spoke to MacDonald during the academic period and stated transgender people were "making it up" and that being transgender was an "illness." The student further stated he would not refer to transgender students with their requested pronouns. MacDonald attempted to engage the student calmly for an educational discussion, but the student became combative and said he "could not help it if people were born with funky junk."

97)     MacDonald reported the incident to Principal Slowikowski and the assistant principal.

98)     In May 2019, a student in MacDonald's class submitted a paper topic on "why we should teach children there are only two genders." MacDonald did not want to allow the student

14

to write a paper on this topic, and in a May 16, 2019, meeting to discuss it, MacDonald explained to school administrators that there had been a recent increase in anti-LGBTQ+ comments in her classroom, and she feared this paper topic would lead to more. She expressed her belief that allowing the student to write the paper would violate other students' rights under Maine law to be free from gender-based bullying in school. She also explained that an ed tech told her that he was seeing an increase in anti-LGBTQ+ discussions in classrooms across the school.

99)     The School ultimately permitted the student to write a paper on this topic, and MacDonald expressed her belief that it empowered any student to write on a topic that targeted a group of people, e.g., in support of white supremacy. Slowikowski responded that it would be resolved on a case by case basis.

100)    On May 22, 2019, Ms. Ward-Downer stopped by an English department meeting. Pelletier asked Ward-Downer what they would be doing on the last day of school. When Ward-Downer told them, Pelletier said: "Good, because last year was really, really awful." Pelletier was referring to the LGBTQ+ training. Ward-Downer did not respond.

101)    On May 31, 2019, the English department had a communication training for all staff. During the training, the trainer used an example of a letter from a man in the 1950s who wanted to fire a female employee who was pregnant. The trainer stated that if staff worked with this man today that they would be required to accept his opinions. MacDonald stated she disagreed that this was merely an "opinion" because the statement was regarding a protected class and it created a hostile work environment.

102)    On June 3, 2019, as MacDonald was leaving school to get lunch, a student yelled at her from a stopped car: "Mrs. MacDonald is a f*ing bitch!" MacDonald reported this incident by

15

email to the vice principal. Based on context, she believed the student was one who became angry when the existence of transgender people came up in her class.

103)    At the end of the 2018-2019 school year, Pelletier and Wellman engaged in a concerted effort to file a formal internal complaint against MacDonald, motivated in part by her advocacy for LGBTQ+ rights.

104)    They approached teachers to ask if they would join in an official complaint against MacDonald.

105)    The campaign resulted in a June 13, 2019, complaint to Principal Slowikowski against MacDonald, signed by thirteen Brewer School Department employees, including Pelletier and Wellman.

106)    MacDonald had very little interaction with most of the people who signed the complaint.

107)    The complaint falsely alleged that MacDonald had created "hostile conditions" and that the "environment" was a direct result of the following actions by MacDonald:

    1. She is aggressive and hostile when in conversations with people she does not agree with (i.e. curriculum leaders, departmental meetings, informal conversations, backchannel defamation, etc.).

    2. She has been hostile towards staff who practice faith/religion.

    3. Bullying of Brewer High School staff for the purpose to coerce into desire outcomes and behavior.

108)    An investigation was conducted internally in which twenty-four employees were interviewed. Many reported having been approached by Pelletier or Wellman to join the complaint.

109)    In almost every interview in which a staff member reported a hostile interaction with MacDonald, the staffer mentioned MacDonald's "opinion" on LGBTQ+ issues or other incidents involving MacDonald's advocacy. For example, the following notes were taken by the person doing the interviews:

- "Michelle tells students what pronouns to use when referring to other people."

- "[Student] was always understanding as staff worked though the transition from male to female and when people would call her the wrong name. But once [Student] joined the GSA she became very intolerant of others who used her dead name. It appeared the views of the student were changed from joining the GSA under Michelle's advisory role."

- "Student...wanted to write a paper in support of the fact that there are just two genders, and Michelle didn't want to allow the topic in her room. This is not an isolated incident, students are all aware of Michelle's opinions."

- "Kids say topics are pushed on them by Michelle. Her beliefs on transgender especially and that there is only one viewpoint in her classroom."

- "Kids say the use of certain terminology and use of pronouns is pushed on them by Michelle."

- "Michelle is a strong advocate for LGBTQ+ rights. Conversations sometimes take a turn into politics - this makes people uncomfortable and they will walk away. If

Michelle is sitting at a table or is outside of the conversation, she will insert herself into the conversation."

- "Students that don't agree with Michelle's philosophy on sexuality issues feel pressured to write from a position that they agree with Michelle's philosophy."

- "Michelle has told a student that they don't know what they are talking about regarding gender sexuality issues. However, the student is conservative, gay and comes from a multi-cultural family so the student lives with these things first hand and DOES know what he is talking about."

- "Michelle interjects, is discriminatory. Can't talk about our president as he is discriminatory ..."

- "Michelle promotes that one side of an issue is correct and the other side is incorrect. During school, promoting one side is not okay. Afterschool GSA club is different."

- "...there was an issue where he was confused regarding pronouns, not trying to be disrespectful, but Michelle attacked [student] over pronoun use."

- "Michelle's personal agenda on LGBTQ+ issues is pushed onto staff and students."

- "[Another interviewee] is a strong mental health proponent/advocate, but her advocacy on this topic did not result in the district having a training on mental health (comparing to Michelle's LGBTQ+ advocacy leading to 10 hours of training on LGBTQ+ issues)."

110)   The following notes were taken during Wellman's interview:

- "Students have asked Paul for help regarding Michelle. They tell him if they express a certain opinion in Michelle's classes, their grades suffer. Pro LGBTQ+ opinions =

18

good grades. Paul tells students he appreciates them asking for help, but to speak to admin. There is only so much he can do as Paul fears retaliation from Michelle."

- "Paul mentioned there are gender related posters as soon as you walk in the school, he knows it's a fact to abide by these things, but could others put up religious artifacts or materials on guns or the military?"

- "Paul described that kids in Michelle's classroom are put on the spot to go around the room at the start of the year and disclose their preferred pronouns. It is a declaration in front of their peers and makes some students uncomfortable."

- "There are posters in the teachers breakroom (propaganda) advocating for her personal beliefs. They are so 'in your face' and no one can say anything about it."

- "Paul feels bullied by Michelle for beliefs he may not even necessarily have."

- "Michelle gave Paul a book when his child was recently born. The book was called 'Color' [it was actually "Red: a Crayon's Story"] and is a banner LGBTQ+ children's book. Michelle said she gave the book to Paul so he could educate himself. Why would she give him this gift? It was offensive, insulting, and an attack."

- "Any issues with Michelle always come back to LGBTQ+ advocacy."

111)    The following notes were taken during Pelletier's interview:

- "Breanne said she was the one who initiated the complaint."

- "She was tired of seeing colleagues anxious and nervous to be around Michelle so she stuck her neck out to see if there would be an [sic] response to making a possible complaint."

19

- "Michelle attacked [a coworker] on Facebook asking how [coworker] can promote a business that is anti-LGBTQ+? Michelle was perceived as aggressive and nasty."

- "Breanne and Michelle have different personalities but in early years working together their relationship was good. Relationship changed when Michelle's [child] transitioned...At that point aggression started when there was a difference of opinion with Michelle."

- "In the teacher's room, Michelle overhears people talking and then says their opinions are wrong. Michelle won't give up when she is lecturing about how others opinions are wrong."

- "Students can get an 'A' if the [sic] speak or write about women's rights or LGBTQ issues. Anything against those positions will be a poor grade."

- "Breanne says Michelle targeted yearbook class students."

- "Michelle comes after teacher Paul Wellman 'like it's her job' but he sticks to his opinions and beliefs."

112)    Many of these statements about MacDonald were blatantly false.

113)    Meanwhile, interviews were being conducted for the Curriculum Leader position held by MacDonald.

114)    The Curriculum Leader was a yearly appointment that MacDonald had filled for the previous seven years. It included a salary enhancement. There had never before been interviews for the appointment.

115)    MacDonald applied for the Curriculum Leader position in the spring of 2019.

20

116)    In June 2019, Principal Slowikowski emailed her that the Brewer School Department would be interviewing applicants for the position.

117)    On June 25, 2019, an art teacher who was then serving as co-advisor of the GSA wrote a letter describing her concerns about the anti-LGBTQ+ environment at Brewer High School, and she gave the letter to a union representative. It reported comments she received by her colleagues, including:

- "I don't get how you know if your kid is transgender. If my kid wants to pretend to be a dog, I'm not going to feed her dog food!"

- "It's okay to be shocked. I'm supposed to call this boy Katherine now? I mean, I'm shocked."

- "What if it's just a phase? Am I supposed to just go along with it?" (Referring to students coming out as transgender).

- "Is transgender a mental disorder?"

118)    The art teacher also described reports from students during GSA meetings about a teacher playing "devil's advocate" who stated that being transgender was a choice and encouraging students in his class to debate whether transgender people should have rights. Students in the GSA feared using their correct names and pronouns in this teacher's class and instead went by their deadnames in order to avoid public ridicule. This teacher further described hostility from colleagues to LGBTQ+ training and a party line from the administration that "it's up to the individual teacher" how to handle anti-gay or anti-transgender comments by students.

119)    A letter, dated June 18, 2019, by an ed tech described similar impressions. He wrote of "a disturbingly vocal hostility towards LGBTQ+ rights in general and the transgender

community specifically" and called for more education within the school community on LGBTQ+ rights.

120)   On June 26, 2019, Principal Slowikowski informed MacDonald that the Curriculum Leader position for the next year would be given to Pelletier instead of MacDonald.

121)   Based on information and belief, the decision was made by Superintendent Towle, Principal Slowikowski, and Ms. Ward-Downer, and they made it intentionally because of MacDonald's LGBTQ+ advocacy, protected oppositional conduct and reporting, WPA-protected activity, and her association with LGBTQ+ individuals.

122)   The rationale Slowikowski stated to MacDonald was that they "chose to offer the position to a teacher they believed would be better able to communicate with colleagues about student needs."

123)   Yet Pelletier told MacDonald in the winter 2019 that she had received a poor performance evaluation due to "communication issues" with colleagues.

124)   After filing a union grievance, MacDonald was later given the position of Co-Curriculum Leader along with Pelletier.

125)   On July l, 2019, MacDonald requested a room change to the other side of the building where she would not have to interact with Wellman and Pelletier on a daily basis.

126)   Principal Slowikowski denied her request and offered her a room two doors down from her current room, which would have kept her close to Wellman and Pelletier.

127)   That decision was overruled by the interim Superintendent after discussions with MacDonald's union.

128)   Slowikowksi then assigned MacDonald to a small, Special Education room, even though larger classrooms were available and MacDonald often had larger class sizes.

129)   On July 19, 2019, the results of the internal investigation into the complaint against MacDonald concluded, in part, that she had not violated "any Brewer School Department policies, rules, or procedures," and that she had "not intentionally engaging in confrontational behavior, nor is her behavior targeted at any particular group of individuals."

130)   The interim Superintendent nevertheless wrote to MacDonald faulting her for "unprofessional" behavior and concluded that she was "ultimately responsible for the way [her] colleagues perceive [her] actions…While I understand that you did not realize you were coming across as unprofessional or rude, it is clear that the perception amongst your colleagues is that, at times, you are overly confrontational."

131)   On July 23, 2019, MacDonald reported to Principal Slowikowski that the transgender flag had been torn down from the cafeteria and stuffed between the microwave and the wall. MacDonald received no response.

132)   On August 6, 2019, MacDonald filed an internal complaint of a discriminatory and hostile work environment and retaliation for reporting same.

133)   On September 16, 2019 during a GSA meeting, a student shared that a science teacher had told his class that the School should not hang LGBTQ+ flags.

134)   On October 15, 2019, MacDonald emailed Principal Slowikowski and the assistant principal about an incident with the same student who had referred to transgender people having "funky junk" during the prior school year. This time, the student tried to engage MacDonald in a

debate about how white, heterosexual men are victims of discrimination and harassment in "today's society." The student repeatedly asked for her opinion, even when she tried to redirect.

135)    On October 29, 2019, MacDonald filed the above-described First Complaint under oath with the MHRC and EEOC against Brewer School Department, Mr. Wellman, and Ms. Pelletier.

136)    Based on information and belief, the First Complaint was received by the Brewer School Department, Mr. Wellman, and Ms. Pelletier shortly thereafter.

137)    In November 2019, MacDonald found that Ms. Pelletier continued to refuse to respond to her emails and would only weigh in when another member of the department brought issues forward.

138)    In December 2019, Principal Slowikowski likewise excluded MacDonald in email communications with other curriculum leaders.

139)    In December 2019, MacDonald was not able to make it to the curriculum leader's meeting because of an injury. She asked Ms. Ward-Downer to please keep her updated and Ward-Downer agreed to. When MacDonald emailed her with questions after the meeting, however, Ward-Downer was intentionally very vague in her responses and MacDonald had to keep asking questions to get her to answer her.

140)    In December 2019, Pelletier refused to provide MacDonald with an agenda prior to a department meeting as previously agreed, and Ms. Ward-Downer failed to respond in a timely manner to MacDonald's email.

141)    In December 2019, during a Poetry Out Loud competition in the lecture hall, Pelletier stated that she wanted to move the English department members' classrooms close to each other

despite her knowledge that MacDonald's room had been moved farther away as an accommodation for MacDonald's mental impairments caused by Pelletier's and Wellman's harassing conduct.

142)   In February 2020 Pelletier refused to respond to MacDonald's upcoming department meeting proposals, failed to inform MacDonald until the last minute that she would not be attending the meeting, and bypassed MacDonald by having her agenda presented at the meeting by others.

143)   On March 4, 2020, MacDonald amended her First Complaint with the MHRC and EEOC to clarify and amplify the allegations therein.

144)   Based on information and belief, MacDonald's amended complaint was received by Brewer School Department, Mr. Wellman, and Ms. Pelletier shortly thereafter.

145)   In March 2020, Pelletier excluded MacDonald from her email communications about a department budgetary matter that was a shared responsibility between them.

146)   In March 2020, MacDonald met with Mr. Palmer and Mr. Slowikowski and explained that the issues with Pelletier were making her job as curriculum leader difficult and her work environment unsafe. She also explained that Pelletier was engaging in gaslighting behavior toward her by suggesting, falsely, that MacDonald was turning other teachers against Pelletier.

147)   In June 2020 MacDonald applied for the Curriculum Leader position for the English Department for the following year.

148)   On August 14, 2020, Principal Slowikowski emailed MacDonald informing her that another candidate had been selected instead of her.

149)   The other candidate was Pelletier.

25

150)   Based on information and belief, the decision to appoint Pelletier instead of MacDonald was made by Mr. Palmer, Mr. Slowikowski, and Ms. Ward-Downer, and they made it intentionally because of MacDonald's LGBTQ+ advocacy, protected oppositional conduct and reporting, WPA-protected activity, MHRC and EEOC complaints, and her association with LGBTQ+ individuals.

151)   As a result, MacDonald realized that future attempts to apply for the Curriculum Leader position would be futile, and she did not reapply in 2021 for that reason.

152)   In January 2021, Pelletier raised during a department meeting that she would like to see the English department move their classrooms near each other. This was again raised despite her knowledge that MacDonald's room had been moved farther away as an accommodation for MacDonald's mental impairments caused by Pelletier's and Wellman's harassing conduct.

153)   In January 2021, MacDonald again raised this issue with Mr. Palmer and Mr. Slowikowski, again requesting that they address it.

154)   Because they did not do so, MacDonald therefore had to file a union grievance in March 2021 to seek correction of the offensive conduct.

155)   In March 2021, MacDonald learned that two of the Brewer High School teachers who had previously signed the petition against her had falsely accused MacDonald of "turning them in" for eating lunch together without following social distancing guidelines.

156)   MacDonald continues to experience hostility from her coworkers, difficulty with communication affecting her ability to perform her duties, and continues to hear discriminatory comments by students.

157)   In response to MacDonald's complaints described above, instead of exercising reasonable care to prevent and correct promptly the harassing behavior, the Brewer School Department, through its leaders, has minimized and dismissed her concerns and attempted to reframe the issues in an effort to marginalize her complaints and make it appear that she was the problem.

158)   The above-described conduct was unwelcome and directed at MacDonald intentionally because of MacDonald's LGBTQ+ advocacy, protected oppositional conduct and reporting, WPA-protected activity, MHRC and EEOC complaints, and her association with LGBTQ+ individuals.

159)   MacDonald's LGBTQ+ advocacy, protected oppositional conduct and reporting, WPA-protected activity, MHRC and EEOC complaints raised matters of public concern.

160)   The above-described conduct affected the terms, conditions, or privileges of MacDonald's employment and created an intimidating, hostile, and offensive working environment.

161)   It was both objectively and subjectively offensive, such that a reasonable person would find it hostile and abusive, and MacDonald in fact did perceive it to be so.

162)   The Brewer School Department, Gregg Palmer, Cheri Towle, Brent Slowikowski, and Renita Ward-Downer knew or should have known of the conduct and failed to take immediate and appropriate corrective action.

163)   The above-described conduct would well dissuade a reasonable worker from engaging in LGBTQ+ advocacy, protected oppositional conduct and reporting, WPA-protected activity, filing MHRC and EEOC complaints, and raising matters of public concern.

164)    The above-described conduct was intentional and undertaken with malice or reckless indifference to MacDonald's rights under the MHRA, the WPA, Title VII, the First Amendment, and the Equal Protection Clause.

165)    The individual Defendants were deliberately indifferent to MacDonald's rights under the First Amendment and the Equal Protection Clause.

166)    As a result of Defendants' unlawful discrimination MacDonald has suffered lost wages, lost benefits, loss of enjoyment of life, loss of self-esteem, injury to reputation, injury to career, emotional pain, suffering, inconvenience, and other pecuniary and non-pecuniary losses.

167)    MacDonald has no plain, adequate, or complete remedy at law to fully redress the wrongs alleged, and she will continue to suffer irreparable injury from her treatment by Defendants unless Defendants are enjoined by this court.

### COUNT I:  MHRA VERSUS BREWER SCHOOL DEPARTMENT

168)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

169)    The Brewer School Department is liable to MacDonald under the MHRA because MacDonald was subjected to a hostile work environment because of sex, sexual orientation, sexual orientation or gender identity, WPA-protected activity; and because she opposed a practice that would be a violation of the MHRA and made a charge, testified or assisted in an investigation, proceeding, or hearing under the MHRA.

170)    The Brewer School Department is liable to MacDonald under the MHRA because MacDonald was subjected to adverse employment actions because of sex, sexual orientation, sexual orientation or gender identity, WPA-protected activity; and because she opposed a

28

practice that would be a violation of the MHRA and made a charge, testified or assisted in an investigation, proceeding, or hearing under the MHRA.

171)   The Brewer School Department is liable to MacDonald under the MHRA because MacDonald was subjected to materially adverse actions because she opposed a practice that would be a violation of the MHRA and made a charge, testified or assisted in an investigation, proceeding, or hearing under the MHRA.

## COUNT II:  TITLE VII VERSUS BREWER SCHOOL DEPARTMENT

172)   MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

173)   The Brewer School Department is liable to MacDonald under Title VII because MacDonald was subjected to a hostile work environment because of sex.

174)   The Brewer School Department is liable to MacDonald under Title VII because MacDonald was subjected to adverse employment actions because of her sex.

175)   The Brewer School Department is liable to MacDonald under Title VII because MacDonald was subjected to materially adverse actions because she opposed practices made an unlawful employment practice by Title VII, and because she made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.

## COUNT III:  MHRA VERSUS BREANNE PELLETIER

176)   MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

177)    Breanne Pelletier is liable under the MHRA because she interfered with MacDonald's right to be free from discrimination and retaliated against MacDonald because she opposed unlawful practices under the MHRA. *See* 5 M.R.S. § 4633(1), (2).

## COUNT IV: FIRST AMENDMENT
## VERSUS GREGG PALMER

178)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

179)    Gregg Palmer violated MacDonald's rights under the First Amendment by failing to stop the retaliation against MacDonald for complaining about matters of public concern, and by himself retaliating against MacDonald for complaining about matters of public concern.

## COUNT V: FIRST AMENDMENT
## VERSUS CHERI TOWLE

180)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

181)    Cheri Towle violated MacDonald's rights under the First Amendment by failing to stop the retaliation against MacDonald for complaining about matters of public concern, and by herself retaliating against MacDonald for complaining about matters of public concern.

## COUNT VI: FIRST AMENDMENT
## VERSUS BRENT SLOWIKOWSKI

182)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

183)    Brent Slowikowski violated MacDonald's rights under the First Amendment by failing to stop the retaliation against MacDonald for complaining about matters of public

concern, and by himself retaliating against MacDonald for complaining about matters of public concern.

## COUNT VII: FIRST AMENDMENT
## VERSUS RENITA WARD-DOWNER

184)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

185)    Renita Ward-Downer violated MacDonald's rights under the First Amendment by failing to stop the retaliation against MacDonald for complaining about matters of public concern, and by herself retaliating against MacDonald for complaining about matters of public concern.

## COUNT VIII: FIRST AMENDMENT
## VERSUS PAUL WELLMAN

186)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

187)    Paul Wellman violated MacDonald's rights under the First Amendment by retaliating against MacDonald for complaining about matters of public concern.

## COUNT IX: FIRST AMENDMENT
## VERSUS BREANNE PELLETIER

188)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

189)    Breanne Pelletier violated MacDonald's rights under the First Amendment by retaliating against MacDonald for complaining about matters of public concern.

## COUNT X: EQUAL PROTECTION
## VERSUS GREGG PALMER

190)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

191)    Gregg Palmer violated MacDonald's rights to Equal Protection by discriminating against MacDonald because of sex, failing to stop the retaliation against MacDonald for complaining about sex discrimination, and by himself retaliating against MacDonald for complaining about sex discrimination.

## COUNT XI: EQUAL PROTECTION
## VERSUS CHERI TOWLE

192)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

193)    Cheri Towle violated MacDonald's rights to Equal Protection by discriminating against MacDonald because of sex, failing to stop the retaliation against MacDonald for complaining about sex discrimination, and by herself retaliating against MacDonald for complaining about sex discrimination.

## COUNT XII: EQUAL PROTECTION
## VERSUS BRENT SLOWIKOWSKI

194)    MacDonald repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

195)    Brent Slowikowski violated MacDonald's rights to Equal Protection by discriminating against MacDonald because of sex, failing to stop the retaliation against MacDonald for complaining about sex discrimination, and by himself retaliating against MacDonald for complaining about sex discrimination.

## COUNT XIII: EQUAL PROTECTION
## VERSUS RENITA WARD-DOWNER

196)     MacDonald repeats and realleges each of the allegations set forth in the preceding

paragraphs as if fully set forth herein.

197)     Renita Ward-Downer violated MacDonald's rights to Equal Protection by

discriminating against MacDonald because of sex, failing to stop the retaliation against

MacDonald for complaining about sex discrimination, and by herself retaliating against

MacDonald for complaining about sex discrimination.

## COUNT XIV: EQUAL PROTECTION
## VERSUS PAUL WELLMAN

198)     MacDonald repeats and realleges each of the allegations set forth in the preceding

paragraphs as if fully set forth herein.

199)     Paul Wellman violated MacDonald's rights to Equal Protection by discriminating

against MacDonald because of sex and retaliating against MacDonald for complaining about sex

discrimination.

## COUNT XV: EQUAL PROTECTION
## VERSUS BREANNE PELLETIER

200)     MacDonald repeats and realleges each of the allegations set forth in the preceding

paragraphs as if fully set forth herein.

201)     Breanne Pelletier violated MacDonald's rights to Equal Protection by discriminating

against MacDonald because of sex and by retaliating against MacDonald for complaining about

sex discrimination.

**DEMAND FOR JURY TRIAL**

202)    MacDonald demands a trial by jury on all matters to which MacDonald has a right to trial by jury.

**PRAYER FOR RELIEF**

Wherefore, MacDonald respectfully requests that this Court grant the following relief:

(a)    Enter Judgment in her favor;

(b)    Declare the conduct engaged in by Defendants to be in violation of MacDonald's rights;

(c)    Enjoin Defendants, their agents, successors, employees, and those acting in concert with Defendants from continuing to violate the rights of the MacDonald;

(d)    Order Defendants to reinstate MacDonald to her former position as Curriculum Leader, with the same pay, benefits, and seniority as if none of the discrimination had occurred or, in lieu of such reinstatement if it is determined to be impracticable, order front pay and benefits;

(e)    Award MacDonald back pay, lost employment benefits, other lost compensation, and interest on those amounts against Defendants;

(f)    Award MacDonald compensatory damages for emotional distress, injury to reputation and career, loss of enjoyment of life, and other non-pecuniary losses;

(g)    Award MacDonald an amount to offset the state and federal taxes she will be required to pay for compensatory damages and any increased taxes she will have to pay because she has received a lump sum for lost wages, employment benefits, or other lost compensation against Defendants;

34

(h)    Award MacDonald nominal damages;

(i)    Award MacDonald punitive damages;

(j)    Award MacDonald the maximum civil penalty under the MHRA on her claims against Wellman and Pelletier individually;

(k)    Award MacDonald attorney's fees, including legal expenses, expert witness fees, and costs of suit;

(l)    Award MacDonald prejudgment interest; and

(m)    Grant MacDonald such other and further relief as may be just and proper.

Dated: January 30, 2022                    /s/ John P. Gause

                                           _____
                                           John P. Gause, Esq., Bar No. 8192
                                           Eastern Maine Law, LLC, P.A.
                                           23 Water St., Suite 202
                                           Bangor, ME 04401
                                           (207) 947-5100
                                           jgause@easternmainelaw.com

                                           ATTORNEY FOR PLAINTIFF