## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

MICHELLE MACDONALD,     )
                           )
          Plaintiff,     )
                           )
v.                     )   Docket No. 1:22-cv-00024-NT
                           )
BREWER SCHOOL DEPARTMENT,   )
et al.,                     )
                           )
          Defendants.   )

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

Before me are the Defendants' motions to dismiss the Plaintiff's Complaint. For the reasons stated below, Defendant Brewer School Department's motion to dismiss (ECF No. 8) is **GRANTED IN PART** and **DENIED IN PART**. The motion to dismiss (ECF No. 9) of Defendants Gregg Palmer, Cheri Towle, Brent Slowikowski, Renita Ward-Downer, Paul Wellman, and Breanne Pelletier (together, the "**Individual Defendants**") is **GRANTED IN PART** and **DENIED IN PART**.

## FACTUAL BACKGROUND[1]

The Plaintiff, Michelle MacDonald, has worked as an English teacher at Brewer High School since 2007. First Am. Compl. ¶¶ 1, 10, 41 (ECF No. 14-1). In addition to teaching, MacDonald also served as the Curriculum Leader—a

---

[1]     Seeing no objection from the Defendants, and in the interest of justice, I **GRANT** the Plaintiff leave to amend her Complaint. Pl.'s Mot. to Amend Compl. (ECF No. 14); *see* Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."). These facts are thus drawn from the allegations in the Plaintiff's First Amended Complaint (ECF No. 14-1), which I take as true for the purpose of deciding a motion to dismiss. *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021).

department chair—for seven years and as the co-advisor for the school's Gender and Sexuality Alliance ("**GSA**"). First Am. Compl. ¶¶ 42, 44. MacDonald has a transgender child who attends a different school. First Am. Compl. ¶ 43. MacDonald states that she "is well known for her advocacy on behalf of LGBTQ+[2] students," and alleges that, beginning in 2017, she started experiencing pushback, hostility, and even retaliation in response to that advocacy. First Am. Compl. ¶¶ 1, 44, 47–158.

On January 20, 2017, MacDonald met with Defendant Superintendent Cheri Towle to discuss concerns about the treatment of transgender students at the school, including MacDonald's concern that some teachers were using students' "deadnames"[3] and former pronouns instead of their correct names and preferred pronouns. First Am. Compl. ¶¶ 16–17, 48. Towle "appeared uncomfortable and defensive with the conversation" and questioned whether younger students had the right to go by their preferred gender pronouns because the students could "change their mind." First Am. Compl. ¶¶ 50–52.

In March of 2017, students approached MacDonald with concerns that the GSA was being excluded from the yearbook. First Am. Compl. ¶ 53. MacDonald contacted Defendant Breanne Pelletier, another English teacher at the school who served as the yearbook advisor and decided which clubs were included in the yearbook. First

---

[2]    LGBTQ+ is "[a]n acronym for 'lesbian, gay, bisexual, transgender and queer' with a '+' sign to recognize the limitless sexual orientations and gender identities used by members of [the LGBTQ+] community." Human Rights Campaign, Glossary of Terms, https://www.hrc.org/resources/glossary-of-terms (last visited Jan. 12, 2023).

[3]    A "deadname" is "the name that a transgender person was given at birth and no longer uses upon transitioning." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/deadname (last visited Jan. 12, 2023).

Am. Compl. ¶¶ 24–25, 54. Pelletier told MacDonald that the GSA was not going to be included in the yearbook because it was a "support group" and did not do "anything worth taking pictures of." First Am. Compl. ¶ 55. After MacDonald reported the issue to the Brewer School Department, Pelletier was told that the GSA must be included in the yearbook. First Am. Compl. ¶ 56. Subsequently, Pelletier, with whom MacDonald had previously gotten along, began giving MacDonald "dirty looks," called her a "drama queen," stopped responding to MacDonald's emails, spoke negatively about her to students, and was rude and hostile to her in meetings. First Am. Compl. ¶¶ 47, 57.

In June of 2017, MacDonald requested that the GSA advisor position be paid a stipend, consistent with other club advisors at the school. First Am. Compl. ¶ 58. A few months later, on September 17, 2017, MacDonald reported to Defendant Principal Brent Slowikowski some comments made by a colleague regarding this request. First Am. Compl. ¶¶ 18–19, 59. That colleague, Defendant Paul Wellman, another English teacher, had expressed that the GSA advisor position should not be paid because it was "like a religion" and that MacDonald was "influencing students with her beliefs." First Am. Compl. ¶¶ 22–23, 59, 61. Wellman also told MacDonald that he viewed people in the LGBTQ+ community as "unnatural" and as "mutations of nature." First Am. Compl. ¶ 61. When reporting the comments, MacDonald also requested that Slowikowski implement more LGBTQ+ rights and awareness training for staff. First Am. Compl. ¶ 62.

3

A few weeks later, on October 6, 2017, Slowikowski intervened in a heated discussion between MacDonald and Wellman about what MacDonald and some students perceived as a culture of hostility toward LGBTQ+ people in Wellman's classroom. First Am. Compl. ¶¶ 63–66. MacDonald stated that a student had recently transferred from Wellman's classroom to MacDonald's because they had come out and were uncomfortable with Wellman's known opposition to LGBTQ+ rights. First Am. Compl. ¶ 67. MacDonald also said that comments made by Wellman made her uncomfortable because she was the parent of a transgender child. First Am. Compl. ¶ 69. Slowikowski told MacDonald that she was "too close to the issue" because of her transgender child. First Am. Compl. ¶ 70.

On January 17, 2018, MacDonald informed Slowikowski that Pelletier was refusing to respond to her work-related emails and that her conduct appeared to be in retaliation for MacDonald's opposition to Pelletier excluding the GSA from the yearbook. First Am. Compl. ¶ 73. On March 15, 2018, Slowikowski called a meeting with MacDonald, the assistant principal, and Pelletier about the GSA's yearbook photos. First Am. Compl. ¶ 78. Notably, MacDonald's co-advisor for the GSA was not asked to attend. First Am. Compl. ¶ 80. At the meeting, Pelletier asserted that MacDonald was making it difficult to get the necessary pictures of the group for the yearbook, while MacDonald explained that she had simply asked, for the safety of the student members of the GSA, that any photographs of the students be taken only with their consent. First Am. Compl. ¶¶ 79–81. Pelletier stated repeatedly during the meeting that she did not like MacDonald and there was nothing MacDonald could do

to change her mind. First Am. Compl. ¶ 85. Neither Slowikowski nor the assistant principal did anything to address Pelletier's statements. First Am. Compl. ¶ 86.

In April of 2018, MacDonald filed an affirmative action complaint with the Brewer School Department alleging that she was being subjected to a hostile work environment. First Am. Compl. ¶ 89. In connection to settling a union grievance with MacDonald, the school agreed—after multiple requests from MacDonald—to hold an LGBTQ+ rights training for staff members. First Am. Compl. ¶ 90. The school administration, however, chose to hold the training after classes ended on the last day of school in June of 2018—a day when teachers are usually permitted to leave at 12:30 pm. First Am. Compl. ¶¶ 90–91.

During the following school year, MacDonald reported several student-related incidents to Slowikowski and the vice principal, including combative, anti-LGBTQ+ remarks made by students during class and a student tearing down a "Gender 101" poster, making a derogatory comment about it, and stomping on it. First Am. Compl. ¶¶ 92, 94–97. Following at least one of those occasions, Slowikowski refused to tell the student that his behavior was unacceptable. First Am. Compl. ¶ 95. On June 3, 2019, a student—who MacDonald believed had gotten angry during a class conversation where transgender issues were mentioned—yelled at MacDonald, "Mrs. MacDonald is a f*ing bitch!" First Am. Compl. ¶¶ 96, 102. MacDonald reported the incident to the vice principal via email, but it is not clear if any action was taken. First Am. Compl. ¶ 102.

At the end of the 2018–2019 school year, Pelletier and Wellman spearheaded an effort to file an internal complaint against MacDonald. First Am. Compl. ¶ 103. On June 13, 2019, thirteen Brewer School Department employees, including Pelletier and Wellman, submitted a complaint about MacDonald to Principal Slowikowski. First Am. Compl. ¶ 105. The complaint accused MacDonald of being hostile toward religious people and people she does not agree with, and of bullying staff members. First Am. Compl. ¶ 107. During an internal investigation into the complaint, twenty-four employees were interviewed. First Am. Compl. ¶ 108. In those interviews in which a staff member reported a hostile interaction with MacDonald, almost every example of "hostility" focused on MacDonald's advocacy related to LGBTQ+ issues. First Am. Compl. ¶ 109. The results of the internal investigation concluded that she had not violated "any Brewer School Department policies, rules, or procedures." First Am. Compl. ¶ 129. Despite that finding, the interim superintendent wrote to MacDonald that she had exhibited "unprofessional" behavior and that she was "ultimately responsible for the way her colleagues perceive her actions." First Am. Compl. ¶ 130. The interim superintendent stated that "[w]hile I understand that you did not realize you were coming across as unprofessional or rude, it is clear that the perception amongst your colleagues is that, at times, you are overly confrontational." First Am. Compl. ¶ 130.

That spring, MacDonald reapplied for the Curriculum Leader position that she had held for seven years. First Am. Compl. ¶¶ 42, 114–15. The Curriculum Leader position is a yearly role that comes with a salary enhancement. First Am. Compl.

¶ 114. Though it had never done so before, the school administration decided to interview different applicants for the job. First Am. Compl. ¶¶ 114, 116. Ultimately, Defendants Towle, Slowikowski, and Renita Ward-Downer, the school's Director of Instruction, hired Pelletier as Curriculum Leader. ¶¶ 20–21, 120–21. Slowikowski told MacDonald that Pelletier was hired because they "chose to offer the position to a teacher they believed would be better able to communicate with colleagues about student needs." First Am. Compl. ¶ 122. In the winter of 2019, however, Pelletier had told MacDonald that she received a poor performance evaluation for "communication issues" with colleagues. First Am. Compl. ¶ 123. MacDonald filed a union grievance and was ultimately given the position of Co-Curriculum Leader with Pelletier. First Am. Compl. ¶ 124.

On July 1, 2019, MacDonald requested a room change to the other side of the building so that she would not have to interact with Wellman and Pelletier on a daily basis. First Am. Compl. ¶ 125. Slowikowski initially denied her request, but, after his decision was overruled by the interim superintendent, Slowikowski assigned MacDonald to a small, special education room, even though larger classrooms were available and MacDonald had larger class sizes. First Am. Compl. ¶¶ 126–28.

On July 23, 2019, MacDonald told Slowikowski that the transgender flag had been torn down in the cafeteria and stuffed between the microwave and the wall. First Am. Compl. ¶ 131. MacDonald received no response and filed an internal complaint. First Am. Compl. ¶¶ 131–32.

On October 29, 2019, MacDonald filed a complaint with the Maine Human Rights Commission ("**MHRC**") and the Equal Employment Opportunity Commission ("**EEOC**") against Brewer School Department, Wellman, and Pelletier. First Am. Compl. ¶ 135. After that, colleagues, including Pelletier, Slowikowski, and Ward-Downer, appeared to shut MacDonald out of curriculum- and school-related discussions completely. First Am. Compl. ¶¶ 137–40, 142, 145.

Other attempts by MacDonald to get support from the school administration were also unsuccessful. In March of 2020, for example, MacDonald met with Defendant Gregg Palmer, who had replaced Towle as the superintendent by that point, and Slowikowski to discuss the issues she was having with Pelletier, which she stated were making her job difficult "and her work environment unsafe." First Am. Compl. ¶¶ 14–15, 146. According to MacDonald, however, "instead of exercising reasonable care to prevent and correct promptly the harassing behavior, the Brewer School Department . . . minimized and dismissed her concerns . . . ." First Am. Compl. ¶ 157. Adding insult to injury, in June of 2020, MacDonald once again applied to be Curriculum Leader, but, again, Pelletier was hired instead of her. First Am. Compl. ¶¶ 147–49. MacDonald alleges that, to this day, she "continues to experience hostility from her coworkers, difficulty with communication affecting her ability to perform her duties, and continues to hear discriminatory comments by students." First Am. Compl. ¶ 156.

Earlier this year, MacDonald brought suit against the Brewer School Department and the Individual Defendants, alleging violations of her state and

federal rights. Compl. (ECF No. 1). Now, the Defendants move to dismiss the Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendant Brewer School Department moves to dismiss the claims against it (Counts I and II) and the claims against the school employees in their official capacities (Counts IV, V, VI, VII, X, XI, XII, and XIII). Def. Brewer School Department's Mot. to Dismiss for Failure to State a Claim ("**Brewer School Dep't's MTD**") (ECF No. 8). The Individual Defendants move to dismiss the claims against them in their individual capacities (Counts III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, and XV). Mot. to Dismiss for Failure to State a Claim of Defs. Gregg Palmer, Cheri Towle, Brent Slowikowski, Renita Ward-Downer, Paul Wellman, and Breanne Pelletier ("**Individual Defs.' MTD**") (ECF No. 9).

## LEGAL STANDARD

The Defendants have moved to dismiss all counts of the Plaintiff's Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Rule 12(b)(6) requires dismissal when a complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When evaluating a motion to dismiss, I take "as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Alston v. Spiegel*, 988 F.3d 564, 571 (1st Cir. 2021) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). "[A] complaint will survive a motion to dismiss when it alleges 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible" if the facts alleged give rise to a reasonable inference

of liability. *Id.* "Plausible" means "more than merely possible." *Germanowski v. Harris*, 854 F.3d 68, 71 (1st Cir. 2017) (quoting *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012)).

## DISCUSSION

### I.   Statutory Claims

Counts I and II of the Plaintiff's First Amended Complaint assert claims against Defendant Brewer School Department pursuant to the Maine Human Rights Act (the "**MHRA**") (Count I) and Title VII of the Civil Rights Act of 1964 ("**Title VII**") (Count II). First Am. Compl. ¶¶ 168–75. Defendant Brewer School Department moves to dismiss these counts on the grounds that some of the claims are untimely and that the Plaintiff has failed to allege a cognizable associational discrimination claim, plausibly plead a claim for hostile environment harassment, or adequately allege a retaliation claim. Below I first address the issue of timeliness, then I analyze the Title VII claims, and then I turn to the MHRA claims.

### A.   Timeliness of Allegations Occurring before December 13, 2018

Both the MHRA and Title VII require that a charge of an unlawful employment practice must be filed within 300 days after the alleged unlawful employment practice occurred. *See* 5 M.R.S. § 4611; 42 U.S.C. § 2000e-5(e)(1). The Brewer School Department argues that because some of the alleged unlawful events in the First Amended Complaint occurred more than 300 days prior to when MacDonald filed her charge with the MHRC, that all such events should be disregarded as time-barred.

Brewer School Dep't's MTD 7.[4] The Plaintiff responds that otherwise untimely allegations should be allowed in under the "continuing violation doctrine." Pl.'s Obj. to Def. Brewer School Department's Mot. to Dismiss ("**Pl.'s Obj. to Brewer School Dep't's MTD**") 2–3 (ECF No. 12).

"The continuing violation doctrine is an equitable exception to Title VII's 300-day time limit and 'allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims.' " *Ramsdell v. Huhtamaki, Inc.*, 992 F. Supp. 2d 1, 18 (D. Me. 2014) (quoting *Lockridge v. Univ. of Me. Sys.*, 597 F.3d 464, 474 (1st Cir. 2010)); *Ayala v. Shinseki*, 780 F.3d 52, 57 (1st Cir. 2015) ("Under the continuing violation doctrine, a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period." (quoting *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009) (internal quotation marks omitted))). "However, this doctrine does not apply to 'discrete acts' of alleged discrimination that occur on a 'particular day,' " such as "termination, failure to promote, denial of transfer," denial of reasonable accommodation, transfer to another office, and/or the failure to assign work to an employee. *Id.*

---

[4]     The parties disagree as to whether the 300-day look-back period began on December 13, 2018, 300 days before MacDonald filed her intake questionnaire with the Maine Human Rights Commission (the "**MHRC**"), or on January 3, 2019, 300 days before MacDonald filed a complaint with the MHRC. I need not adjudicate this dispute because the Plaintiff does not allege any relevant conduct that occurred between December 13, 2018, and January 3, 2019. For simplicity's sake, I use the earlier date, December 13, 2018, as the beginning of the look-back period.

The continuing violation doctrine is most obviously applicable to hostile work environment claims: "[B]ecause hostile work environment claims typically involve patterns of conduct and so 'cannot be said to occur on any particular day,' a court may consider 'the entire time period of the hostile environment' so long as any 'act contributing to the claim occured within the filing period.' " *Lee v. Me. Pub. Emps. Ret. Sys.*, No. 1:21-cv-00219-LEW, 2022 WL 612396, at *2 (D. Me. March 2, 2022) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115–17 (2002)). Any type of discrimination claim, however, could be covered by the doctrine, provided that the claim is one that "by [its] nature, take[s] time to materialize." *Ayala*, 780 F.3d at 58. In all cases, the "[a]llegedly discriminatory or hostile conduct that predates the filing period must substantially relate to later allegations of abuse such that all of the allegations can fairly be said to constitute the same actionable . . . practice." *Lee*, 2022 WL 612396, at *2 (internal quotation marks and citations omitted).

Here, I find that the continuing violation doctrine covers the Plaintiff's discrimination claims. The hostile acts alleged to have occurred prior to the look-back period are all substantially related to the later allegations of abuse because all share the common denominator of anti-LGBTQ+ sentiments and hostility toward MacDonald because of her association with the LGBTQ+ community. Similarly, to the extent that some of the facts underlying the Plaintiff's retaliation claim occurred prior to the look-back period, these facts are asserted to show the motive for the later retaliatory conduct. Moreover, as relates to both the hostile work environment and retaliation claims, none of the pre-look-back period events could be said to be a

"discrete act" that would have triggered the running of the statute of limitations. For these reasons, I conclude that the continuing violation doctrine is applicable to the Plaintiff's claims.

### B.   Title VII Claims

Count II of the Plaintiff's First Amended Complaint asserts claims of discrimination, hostile work environment harassment, and retaliation against Brewer School Department pursuant to Title VII. First Am. Compl. ¶¶ 174–77.

Before diving into these claims, I pause to briefly introduce Title VII, which prohibits certain types of discrimination and retaliation in the employment context. Here, the Plaintiff's Title VII claims implicate three specific provisions of the statute: 42 U.S.C. § 2000e-2(a), 42 U.S.C. § 2000e-2(m), and 42 U.S.C. § 2000e-3(a).

Sections 2000e-2(a) and 2000e-2(m) both fall under the header of "unlawful employment practices," and each describes prohibited discriminatory conduct. Section 2000e-2(a) makes it an unlawful employment practice "to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). By contrast, § 2000e-2(m) states that "an unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice." *Id.* at § 2000e-2(m). The potential import of the difference in wording will be explained in more detail below, but for now it suffices to note that a successful § 2000e-2(m) claim is not entitled to the full spectrum of relief awarded to

13

claims under Section 2000e-2(a). *See id.* § 2000e-5(g)(2)(B); *Tanca v. Nordberg*, 98 F.3d 680, 682 (1st Cir. 1996).

The third relevant provision, § 2000e-3(a), prohibits employer retaliation against an employee for certain activities. Specifically, § 2000e-3(a) makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In the following pages, I evaluate each of the Plaintiff's Title VII claims in light of these provisions.

### 1.    Associational Discrimination

The Plaintiff alleges that she was discriminated against "because of sex" in violation of Title VII. First Am. Compl. ¶ 176. In *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), the Supreme Court recognized that Title VII's prohibition on sex discrimination covers discrimination on the basis of sexual orientation and gender identity. *Id.* at 1737. The catch here is that the Plaintiff does not allege that she was discriminated against because of her own sexual orientation or gender identity; rather, she says that she was discriminated against because of her association with, and advocacy for, members of the LGBTQ+ community. Pl.'s Obj. to Brewer School Dep't's MTD 3. Defendant Brewer School Department attacks the Plaintiff's discrimination claim on the ground that Title VII does not contemplate the type of

associational discrimination asserted by the Plaintiff. Brewer School Dep't's MTD 8–10.

The Defendant is partially correct. Recently, in *Frith v. Whole Foods Market, Inc.,* 38 F.4th 263 (1st Cir. 2022), the First Circuit acknowledged the viability of associational discrimination claims under Title VII, but emphasized that "to constitute unlawful [ ] discrimination under [§ 2000e-2(a)(1)], an employment action must have been taken 'because of' the [protected characteristic] of the individual plaintiff." *Id.* at 271. Thus, relying heavily on a textual reading of the provision, the First Circuit concluded that it would recognize associational discrimination claims pursuant to § 2000e-2(a)(1) only where the plaintiff has been discriminated against because of his, her, or their protected characteristic. *Id.* at 271–74. For example, a white male employee married to a Black woman who was fired because of his employer's disapproval of interracial marriage was fired *because of his race. Id.* at 272. Similarly, where an employer fires a gay man because of the belief that men should not be attracted to other men, that employer discriminates on the *basis of the employee's sex. Id.* By contrast, the *Frith* Court rejected the argument that if the plaintiff is advocating on behalf of a person with a protected characteristic, that characteristic is "imputed" to the plaintiff for the purpose of satisfying § 2000e-2(a)(1)'s requirement that the discrimination be because of the plaintiff's protected characteristic. *Id.* at 273.

Unfortunately, *Frith* was decided after the parties completed briefing on these motions to dismiss. Not having had the benefit of *Frith*, the Plaintiff's Title VII

discrimination claim rests partially on the assertion that she can establish a claim under § 2000e-2(a)(1) by showing that the sexual orientation and gender identity of the group MacDonald advocates on behalf of can be imputed to her. *See* Pl.'s Obj. to Brewer School Dep't's MTD 4.[5] This argument is clearly foreclosed by *Frith* and, as such, the Plaintiff's § 2000e-2(a)(1) claim must be dismissed.

*Frith*, however, addressed only a § 2000e-2(a)(1) claim, which, as previously discussed, makes it an unlawful employment practice to discriminate against any individual "*because of such individual's* . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). The *Frith* Court did not address associational discrimination in the context of § 2000e-2(m), which provides that "an unlawful employment practice is established when the complaining party demonstrates that . . . sex . . . was a *motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Indeed, the First Circuit in *Frith* put considerable weight on the "because of such individual's [protected characteristic]" language, and that language is entirely absent from § 2000e-2(m). *See Frith*, 38 F.4th at 271 ("[T]o constitute unlawful racial discrimination under Title VII, an employment action must have been taken 'because of' the race of the individual plaintiff."). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

---

[5]    The brief filed by the United States similarly urges me to recognize the type of advocacy discrimination claim rejected by the First Circuit in *Frith*. *See* Statement of Interest of the United States of America 3–7 (ECF No. 17).

inclusion or exclusion." *Tanca*, 98 F.3d at 683 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

It is therefore possible, as the Plaintiff contends, *see* Pl.'s Obj. to Brewer School Dep't's MTD 4–5, that the omission of the qualifying phrase "because of such individual's" from § 2000e-2(m) indicates that a plaintiff could succeed on an associational or advocacy theory under that provision without a showing that the discrimination was "because of" her own protected characteristic. Although caselaw on this question is sparse, the Fifth Circuit suggested this very idea in *Carter v. Luminant Power Services Co.*, 714 F.3d 268, 273 (5th Cir. 2013), where the court mused that Section 2000e-2(m)'s exclusion of the "because of such individual's" language could mean that the provision prohibits discrimination based on association or advocacy for persons in a protected class.

The Defendant offers no retort to the Plaintiff's argument that her associational discrimination claim should survive under § 2000e-2(m), and the First Circuit does not appear to have addressed the issue of whether advocacy-based associational discrimination claims might succeed in such a situation. Further briefing might clarify the extent to which the wording differences in various provisions of Title VII affect protected class status, but based on a textual reading, I find that the Plaintiff's associational discrimination claim can proceed under § 2000e-2(m).

### 2.    Hostile Work Environment Harassment

Count II of the Plaintiff's First Amended Complaint asserts a hostile work environment claim against the Brewer School Department under Title VII.[6] To succeed on a hostile work environment claim under Title VII, a plaintiff must establish:

> "(1) that she . . . is a member of a protected class; (2) that she was subjected to unwelcome . . . harassment; (3) that the harassment was based upon [protected conduct or traits]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that [the] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established."

*O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001); *Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 189 (1st Cir 2003); *see also Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005) (explaining elements of hostile work environment claim in retaliatory harassment context). Defendant Brewer School Department challenges the Plaintiff's hostile work environment claim on the grounds that the alleged conduct was not severe or pervasive and that the Plaintiff has failed

---

[6]    The Plaintiff appears to bring her federal hostile work environment claim pursuant to three separate provisions of Title VII. *See* Pl.'s Obj. to Def. Brewer School Department's Mot. to Dismiss 7 (ECF No. 12) (citing 42 U.S.C §§ 2000e-2(a)(1), 2000e-2(m), and 2000e-3(a)). I have already found that the Plaintiff's claims under 42 U.S.C. § 2000e-2(a) must be dismissed because that provision does not recognize the type of associational discrimination alleged by the Plaintiff. As for the Plaintiff's claim under § 2000e-2(m), there is some caselaw that suggests that hostile work environment claims can never be brought under this provision—which seemingly contemplates both permissible and impermissible motivations for conduct—because "[a]n employer could never have a legitimate reason for creating a hostile work environment." *Stacks v. Sw. Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994). The Defendants, however, do not address this possibility and I therefore reserve judgment on the issue.

to plead any facts to plausibly support a finding of employer liability. Brewer School Dep't's MTD 11, 13. I analyze each of these issues below.

### a.    Severity and Pervasiveness

As explained above, a viable hostile work environment harassment claim requires a showing that "the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment." *O'Rourke*, 235 F.3d at 728; *see also Noviello*, 398 F.3d at 92 ("In order to prove a hostile work environment, a plaintiff must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment."). "There is no 'mathematically precise test' for determining when harassment becomes sufficiently severe or pervasive." *Pérez v. Horizon Lines, Inc.*, 804 F.3d 1, 6 (1st Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)). Rather, I must "consider all of the 'attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.' " *Id.* (quoting *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006)). "A hostile work environment generally is not created by a 'mere offensive utterance,' nor does it arise from 'simple teasing, offhand comments, and isolated incidents.' " *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003) (internal citations omitted). "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Noviello*, 398 F.3d at 92.

Here, the Plaintiff has alleged sufficient facts to allow a plausible inference that the conduct was severe and pervasive, in that it occurred frequently during the time period described in the First Amended Complaint and it went beyond a mere offensive utterance. For example, MacDonald describes numerous incidents in which school employees and administrators declined to respond after students made inappropriate and combative comments about transgender people in MacDonald's classroom, tore down and stomped on a poster about gender, and ripped down a transgender flag. First Am. Compl. ¶¶ 94–96, 131–32. In addition, on one occasion, a student yelled at MacDonald that she was a "f*ing bitch." First Am. Compl. ¶ 102. Although it is not clear that all of these statements and actions were directed at MacDonald personally, these allegations do provide support for MacDonald's assertion that the school was rife with anti-LGBTQ+ sentiment. Moreover, while none of these statements or actions were explicitly physically threatening, it is possible to perceive a threatening undercurrent—especially in the incident where a student yelled directly at MacDonald.

In addition, the Complaint plausibly alleges that the conduct unreasonably interfered with MacDonald's work performance. MacDonald alleges that, at various points, she was undermined and ostracized by colleagues, denied classroom resources, and forced out of leadership positions. *Cf. O'Rourke*, 235 F.3d at 730 (explaining that "work sabotage, exclusion, denial of support, and humiliation[,] can in context contribute to a hostile work environment"). For example, the First Amended Complaint alleges that Pelletier refused to reply to work emails from

MacDonald, inappropriately spoke badly of MacDonald in front of students, and responded to a work-related conflict about the GSA's yearbook photo by stating that she did not like MacDonald and there was nothing MacDonald could do to change her mind. First Am. Compl. ¶¶ 73, 83, 85. The First Amended Complaint further alleges that Slowikowski assigned MacDonald to a small classroom, despite the fact that bigger classrooms were available and she had larger class sizes. First Am. Compl. ¶¶ 126–28. Finally, the First Amended Complaint alleges that school leadership pushed MacDonald out of her long-held role as Curriculum Leader. First Am. Compl. 120–21, 147–49. While more factual development will be necessary to determine how and to what extent these events impacted MacDonald's work performance, I find that MacDonald has plausibly alleged conduct that would unreasonably interfere with the work of someone in MacDonald's position.

### b.    Employer Liability

To make a cognizable hostile work environment harassment claim, the Plaintiff must also establish employer liability. "A plaintiff must satisfy different standards for establishing employer liability in a hostile work environment case depending on whether the harasser is a supervisor or co-employee." *Wilson v. Moulison N. Corp.*, 639 F.3d 1, 7 (1st Cir. 2011) (quoting *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002)). "When a supervisor creates a hostile work environment, the employer is vicariously liable for it, subject, however, to a possible affirmative defense." *Noviello*, 398 F.3d at 94. "When coworkers, rather than supervisors, are responsible for the creation and perpetuation of a hostile work environment[,] an employer can only be liable if the harassment is causally connected

21

to some negligence on the employer's part." *Wilson*, 639 F.3d at 7 (quoting *Noviello*, 398 F.3d at 95). "In other words, the plaintiff must demonstrate that the employer knew or should have known about the harassment yet failed to take prompt and appropriate remedial action." *Id.*

In this case, MacDonald seeks to establish employer liability through actions taken by her supervisors/superiors and by her coworkers. There is no question that the Brewer School Department would be vicariously liable for the actions allegedly taken by MacDonald's supervisors. However, some of the instances that MacDonald recounts regarding her coworkers cannot support a finding of employer liability because the school did take prompt and appropriate remedial action. For example, after MacDonald reported Pelletier's refusal to include the GSA in the yearbook, Pelletier was told that she must include the group. First Am. Compl. ¶ 56. And the school agreed to host an LGBTQ+ rights training for staff, albeit at a non-ideal time and only after MacDonald requested such a training several times and then filed a union grievance. First Am. Compl. ¶ 90.

In other instances, though, MacDonald's superiors and the Brewer School Department are alleged to have turned a blind eye to pervasive hostility toward MacDonald. MacDonald reported to the vice principal and to Slowikowski several different instances of inappropriate and combative behavior by students, which the school administration allegedly did nothing to address. First Am. Compl. ¶¶ 94–99, 102. In addition, MacDonald reported to Slowikowski that Pelletier was refusing to respond to her emails, and Pelletier said, in Slowikowski's presence, that she did not

like MacDonald. First Am. Compl. ¶¶ 73, 85. It does not appear that Slowikowski or other members of the school administration ever took steps to address Pelletier's behavior. These instances of hostility and school inaction suffice to establish employer liability at this stage, and the Plaintiff may proceed on her hostile work environment harassment claims.

### 3.    Retaliation

Count II of the Plaintiff's Complaint also includes a claim for retaliation pursuant to 42 U.S.C. § 2000e-3(a). To establish a prima facie case of unlawful retaliation under this provision, a plaintiff must show that "(1) [s]he engaged in protected conduct; (2) [s]he suffered an adverse employment action; and (3) that a causal nexus exists between the protected conduct and the adverse action." *Henderson v. Mass. Bay Transp. Auth.*, 977 F.3d 20, 39 (1st Cir. 2020) (quoting *Carlson v. Univ. of New Eng.*, 899 F.3d 36, 43 (1st Cir. 2018)).

"Protected conduct" under § 2000e-3(a) includes "participation activity," or direct engagement with Title VII proceedings, as well as "oppositional conduct," or "informally opposing an employment activity that might violate Title VII." *See Ray v. Ropes & Gray LLP*, 799 F.3d 99, 107–08 (1st Cir. 2015). Participation activity includes filing a Title VII complaint, informally filing or defending a charge of discrimination, testifying as a witness in a proceeding, or helping a coworker assert her rights. *Id.* at 107. By contrast, oppositional conduct includes "responding to an employer's inquiries about inappropriate behavior, writing letters protesting an employer's allegedly unlawful actions, or picketing and boycotting an employer." *Id.* at 108. To show protected oppositional conduct, a plaintiff need only show she

possessed a good faith, reasonable belief that what she opposed was an illegal employment practice. *Id.* at 110; *Henderson*, 977 F.3d at 39 n.25; *see also Frith*, 38 F.4th at 277 ("[E]mployees who seek the protection of Title VII's retaliation provision must allege opposition to *some* aspect of their employment or the conduct of their employer."). Here, the Plaintiff plausibly alleges that she engaged in protected participation and oppositional conduct by engaging with the Title VII process, filing internal and external complaints, and opposing conduct she believed, in good faith, to be illegal—namely discriminatory and hostile conduct aimed at her. *See, e.g.*, First Am. Compl. ¶¶ 67–68, 89, 124–27, 132, 135, 143, 146, 153–54.

I also consider the second and third prongs of the retaliation analysis—adverse employment action and causation. "An adverse employment action 'typically involves discrete changes in the terms of employment, such as reassignment with significantly different responsibilities, or a decision causing significant change in benefits.' " *Henderson*, 977 F.3d at 41 (quoting *Garmon v. Nat'l R.R. Passenger Corp.*, 844 F.3d 307, 314 (1st Cir. 2016)). "[C]ausation may be inferred from a very close temporal relationship between the protected activity and the adverse action" where the decisionmaker knew of the plaintiff's protected conduct at the time the adverse action was taken. *Valazquez-Ortiz v. Vilsack*, 657 F.3d 64, 72 (1st Cir. 2011). Here, the Plaintiff plausibly alleges that she suffered adverse employment actions—such as losing her role as Curriculum Leader, being moved to a smaller classroom, and being reprimanded—and that the adverse employment actions were taken because the people making those decisions resented the Plaintiff's internal and external

complaints about what she believed to be unlawful employment practices. *See, e.g.*, ¶¶ 120–21, 128, 130, 148–51.

Defendant Brewer School Department opposes the Plaintiff's retaliation claim on the ground that she has failed to allege that any of the parties involved with the decision not to appoint MacDonald as Curriculum Leader "acted with discriminatory animus." Brewer School Dep't's MTD 17. However, the Defendant cites no authority for the proposition that a plaintiff must plead "discriminatory animus" to make out a cognizable retaliation claim. Even assuming that there is such a requirement, " '[s]moking gun' proof of discrimination is rarely available, especially at the pleading stage." *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 49 (1st Cir. 2012). Thus, such proof is not required to survive a motion to dismiss; rather, "[t]he plausibility threshold 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the illegal conduct.' " *Id.* (quoting *Ocasio-Hernàndez v. Fortuño-Burset*, 640 F.3d 1, 17 (1st Cir. 2011)). Here the Complaint allows for a plausible inference of discriminatory and/or retaliatory animus on the part of at least some of the decisionmakers. Specifically, the Complaint alleges that Plaintiff held the position of Curriculum Leader for seven years, with strong performance evaluations, and that she was only stripped of the role after she engaged in oppositional conduct. First Am. Compl. ¶¶ 42, 120–22, 147–51.

Finally, the Defendant's argument deals only with the decision not to make the Plaintiff a Curriculum Leader, but the Plaintiff points to other retaliatory actions— including the room change and the reprimand—to which the Defendant offers no

reply. Accordingly, the Defendant's motion to dismiss the Plaintiff's retaliation claims is denied.

### C.   MHRA Claims

#### 1.   MHRA Claims against Brewer School Department

Count I asserts claims of associational discrimination, hostile work environment harassment, and retaliation against the Brewer School Department pursuant to the MHRA. As for the Plaintiff's associational discrimination claim, the analysis under the MHRA is far more straightforward than under Title VII. That is, as the Plaintiff points out, and the Defendant concedes, the MHRA explicitly covers discrimination "based on [a] person's known relationship or association with a member of a protected class." 5 M.R.S. § 4553(1-D). Moreover, the MHRA does not incorporate Title VII's "because of such individual's" language. *See id.* at § 4572(1). Thus, the Plaintiff's MHRA associational discrimination claim survives at this stage.

As to the hostile work environment and retaliation claims, the "same analytical framework" applies to each under Title VII and the MHRA. *Osher v. Univ. of Maine Sys.*, 703 F. Supp. 2d 51, 64 n.12 (D. Me. 2010); *see also Roy v. Correct Care Sols.*, 914 F.3d 52, 62 (1st Cir. 2019) ("A hostile work environment claim under the MHRA is 'concurrent with Title VII.' " (quoting *Watt v. UniFirst Corp.*, 2009 ME 47, ¶ 22, 969 A.2d 897)). As such, for the same reasons that the Plaintiff's Title VII hostile work environment and retaliation claims survive, so too do her parallel MHRA claims.

#### 2.   MHRA Claim Against Pelletier

In Count III of her Complaint, the Plaintiff asserts an MHRA claim against Pelletier on the ground that she "interfered with MacDonald's right to be free from

26

discrimination and retaliated against MacDonald because she opposed unlawful practices under the MHRA." First Am. Compl. ¶¶ 178–79. The Individual Defendants assert that Count III should be dismissed because individual liability is not available under the MHRA. Individual Defs.' MTD 7–8. The Defendants cite *Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, 53 A.3d 1083, where the Maine Supreme Judicial Court held that, under the MHRA, "there is no individual supervisor liability for employment discrimination." *Id.* ¶ 35. The Plaintiff acknowledges *Fuhrmann*'s holding but argues that the case is distinguishable. Pl.'s Obj. to Individual Defs.' MTD 4–5.

I agree with the Plaintiff that *Fuhrmann* does not control here. *Fuhrmann* concerned the MHRA's core antidiscrimination provision, 5 M.R.S. § 4572(1), which prohibits employment discrimination by an "employer," defined by the statute as a "person . . . employing any number of employees" or an agent of the employer whose "actions are considered the actions of the employer for purposes of liability," 5 M.R.S. § 4553(4). Taking into consideration the text of the statute as well as legislative intent, the *Fuhrmann* Court concluded that, "[p]ursuant to [the MHRA's] statutory definition of 'employer,' there is no individual supervisor liability for employment discrimination." *Fuhrmann*, 2012 ME 135, ¶ 35, 58 A.3d 1083.

In this case, however, the Plaintiff brings her MHRA claim against Pelletier under 5 M.R.S §§ 4633(1) and 4633(2), the retaliation and interference provisions, not § 4572. As the First Circuit recently explained in a case addressing the liability of non-employer third parties for discrimination that occurs in the workplace:

27

*Fuhrmann* never mentioned § 4633, and several significant differences between § 4572 and § 4633 undercut [the] argument that *Fuhrmann*'s holding extends to bar [plaintiff's] claims. First, § 4572 prohibits discrimination by an "employer," and what *Fuhrmann* interpreted was the MHRA's definition of that term. In contrast, § 4633 prohibits discrimination by any "person." Second, § 4633 appears in the miscellaneous section of the MHRA, while *Fuhrmann* interpreted provisions in the MHRA's employment discrimination section. Third, the provisions have different histories, and the enactment of § 4633 more than twenty years after § 4572 is a strong indication that the provisions have different intents.

*Roy*, 914 F.3d at 66 (internal citation omitted).

While the Law Court has yet to address the specific question of whether individual liability is available under the MHRA's retaliation and interference provisions, several pieces of evidence suggest that it is. First and foremost is the text of the statute: while *Fuhrmann* centered on the ambiguity of the term "employer," §§ 4633(1) and 4633(2) prohibit retaliation and interference by a "person," a term that is defined broadly as including "one or more individuals." 5 M.R.S. § 4553(7). I do not see how the term "person" is ambiguous, nor am I persuaded that Pelletier would not be considered a "person" under the plain language of the statute.

Even assuming, *arguendo*, that the provisions in question are ambiguous, the MHRC—the agency charged with administering the MHRA—interprets §§ 4633(1) and 4633(2) as allowing for individual liability. *See* Me. Hum. Rts. Comm'n, Individual Liability after *Fuhrmann v. Staples* (April 11, 2013), https://www.maine.gov/mhrc/sites/maine.gov.mhrc/files/pdfs/20130411_g.pdf. Under Maine law, courts "defer to the agency's interpretation of a statute that is within its area of expertise unless it is unreasonable, that is, unless the statute plainly compels

28

a contrary result." *Fuhrmann*, 2012 ME 135, ¶ 29, 58 A.3d 1083 (quoting *Allied Res., Inc. v. Dep't of Pub. Safety*, 2010 ME 64, ¶ 21, 999 A.2d 940).

The Defendants point out other cases in which courts have rejected the argument that §§ 4633(1) and 4633(2) encompass individual liability, and they urge me to adopt the same conclusion here. *See* Reply in Supp. of Individual Defs.' Mot. to Dismiss 2–3 (ECF No. 16). But several of those cases were decided before *Roy*, and they followed much of the same analysis that the First Circuit rejected there. *See, e.g., United States ex rel. Worthy v. E. Me. Healthcare Sys.*, No. 2:14-cv-00184-JAW, 2017 WL 211609, at *32 (D. Me. Jan. 18, 2017) (holding that, under *Fuhrmann*, "[o]nly an employer can be liable under the MHRA for retaliation . . ."); *Charette v. St. John Valley Soil & Water Conservation Dist.*, No. 1:17-cv-35-GZS, 2017 WL 2683951, at *12 (D. Me. June 20, 2017) (holding that individual liability is not available under §§ 4633(1) and 4633(2) on the ground that *Fuhrmann* "essentially addressed" the meaning of the word "person" as used in those provisions).

Various cases decided after *Roy* continued to employ the same flawed reasoning, discounting *Roy*'s persuasive power by reading it narrowly. *See Huard v. Kennebec Cnty.*, No. 1:16-cv-00473-GZS, 2019 WL 1264864, at *2 n.4 (D. Me. March 19, 2019) (explaining that *Roy* "open[ed] the door to § 4633 claims 'against third parties not alleged to be agents of the employer' " but concluding that *Roy* does not apply to claims against individual employees)[7]; *Furrow v. Hannaford Bros. Co., LLC*,

---

[7]    An opinion was issued in a related case that contained an identical analysis of *Roy*. *See DiGiacomo v. Kennebec Cnty.*, No. 1:18-cv-163-GZS, 2019 WL 1270927, at *1 n.4 (March 19, 2019).

No. CV-22-0008, at 8 n.4 (Me. Super. Ct., Pen. Cnty., May 16, 2022) ("In *Roy*, the federal appellate court, applying Maine law, held that the MHRA provides a remedy for unlawful employment discrimination that is perpetrated by a third-party entity to which the plaintiff's employer has instructed plaintiff to provide services. The Court does not find *Roy* to be persuasive in regard to the wholly separate issue of whether a MHRA plaintiff can hold their own employer's individual supervisory employees personally liable for employment discrimination."). I do not read *Roy* the same way. While that case specifically concerned non-employer third-party liability under the MHRA, its reasoning casts doubt on the notion that *Fuhrmann* necessarily addressed the MHRA's retaliation and interference provisions, or that those provisions must inevitably be interpreted the same way as the distinctly worded antidiscrimination provision. And it is difficult to shake the impression that the courts that have decided that § 4633 does not provide for a claim against an individual are relying on what they think the statute must mean rather than what it plainly states.

Whether to recognize individual liability for a coworker like Pelletier is a difficult decision with significant policy implications, and I am not going to make the final determination on the briefing that I have before me, which merely scratches the surface of this knotty area of the law.[8] For now, I am following what I believe is the

---

[8]   Several key questions are yet to be resolved. For example, the parties have not provided any analysis of the legislative history of 5 M.R.S. § 4633, and they do not address how remedies available under the MHRA could apply to individuals. Moreover, the parties do not address whether a mere coworker—as opposed to a supervisor—can ever be held liable under § 4633(1) and § 4633(2). Nor do the parties address whether MHRA retaliation and/or interference claims require an adverse employment action element, and, if so, when, if ever, a coworker's actions qualify as an adverse

plain meaning of §§ 4633(1) and 4633(2), as guided by the First Circuit's decision in *Roy*, and I accept at this stage that these provisions may provide for individual liability.

## II.   Constitutional Claims

Counts IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, XIV, and XV assert violations of the First Amendment and the Equal Protection Clause against the Individual Defendants—Gregg Palmer (the superintendent), Cheri Towle (the former superintendent), Brent Slowikowski (the principal), Renita Ward-Downer (the director of instruction), Paul Wellman (a fellow English teacher), and Breanne Pelletier (another fellow English teacher)—pursuant to 42 U.S.C. § 1983. The claims against Palmer, Towle, Slowikowski, and Ward-Downer (together, the "**Official Defendants**") are brought in these Defendants' official capacities *and* in their individual capacities, while the claims against Wellman and Pelletier are brought only in those Defendants' individual capacities. First Am. Compl. 1.

In general, "Section 1983 'affords a private right of action in favor of persons whose federally assured rights are abridged by state actors.' " *Parker v. Landry*, 935 F.3d 9, 14 (1st Cir. 2019) (quoting *Kando v. R.I. State Bd. of Elections*, 880 F.3d 53, 58 (1st Cir. 2018)). But the distinction between an official-capacity and individual-capacity suit in § 1983 is a meaningful one: while an individual-capacity suit asserts liability against the individual, an official-capacity suit "is tantamount to a suit

---

employment action. Further factual development and briefing on these issues may help clarify whether the Plaintiff's MHRA claim against Pelletier is a viable one.

against the entity of which the official is an agent," and thus attaches liability to the municipal entity. *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 7 (1st Cir. 2002). Here, the Defendants have filed two separate motions to dismiss to address the Plaintiff's two different types of claims. Defendant Brewer School Department moves to dismiss the official-capacity claims against the Official Defendants, while the Individual Defendants move to dismiss the individual-capacity claims against themselves.

Below, I analyze the Plaintiff's constitutional claims. First, I consider whether the Plaintiff has asserted sufficient facts to establish that a First Amendment violation occurred. I then address the issues of municipal liability and qualified immunity because the Defendants raised these potential defenses in the context of the Plaintiff's First Amendment claims. Second, I consider whether the Plaintiff has successfully alleged an equal protection claim.

## A.    First Amendment

### 1.    Alleged Violations

"Government actors offend the First Amendment when they retaliate against an individual for constitutionally protected speech." *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011).[9] "In order to establish a prima facie case of First Amendment retaliation, a plaintiff must show: (1) that 'he or she engaged in constitutionally protected conduct'; (2) that 'he or she was subjected to an adverse action by the defendant'; and (3) that 'the protected conduct was a substantial or

---

[9]    The First Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).

motivating factor in the adverse action.' " *Pollack v. Reg'l Sch. Unit 75*, Docket No. 2:13-cv-109-NT, 2016 WL 335860, at *5 (D. Me. Jan. 27, 2016) (quoting *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012)), *vacated on other grounds*, 660 Fed. Appx. 1 (1st Cir. 2016).

In this case, the Plaintiff asserts that the Individual Defendants violated her First Amendment rights "by failing to stop the retaliation against MacDonald for complaining about matters of public concern" and by "retaliating against MacDonald for complaining about matters of public concern." First Am. Compl. ¶¶ 181, 183, 185, 187, 189, 191. The Defendants argue that the Plaintiff's First Amendment claims should fail because she did not engage in constitutionally protected speech activity and she has not shown that any of the Individual Defendants took an adverse employment action against her that was motivated by that protected speech activity. Brewer School Dep't's MTD 18–19; Individual Defs.' MTD 11–13.

In evaluating the Plaintiff's First Amendment claims, I turn first to the protected-conduct prong. A public employee's speech is protected by the First Amendment when "the employee spoke as a citizen and . . . the speech was on a matter of public concern." *Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007). "Speech involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.' " *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "If [a] plaintiff's speech is not on a matter of public concern,

there is no First Amendment cause of action. . . . Therefore, it is vital for any claim to clearly present the protected activity on which it is premised." *Rosaura Bldg. Corp. v. Mun. of Mayagüez*, 778 F.3d 55, 66–67 (1st Cir. 2015).

Here, the Plaintiff asserts that her "LGBTQ+ advocacy, protected oppositional conduct and reporting, WPA-protected activity, [and] MHRC and EEOC complaints raised matters of public concern." First Am. Compl. ¶ 159. In particular, the Plaintiff's Complaint alleges that MacDonald repeatedly advocated for LGBTQ+ students and on LGBTQ+-related issues, that she reported what she perceived to be discriminatory conduct on numerous occasions, including conduct that she believed to be directly targeting herself and students, and that she filed a complaint of employment discrimination with the relevant state body. These allegations easily satisfy the first prong of a prima facie First Amendment retaliation suit—it is well-established that speech regarding discrimination and/or discriminatory practices can be protected citizen speech that raises matters of public concern. *See, e.g.*, *Roy*, 914 F.3d at 73 (finding that an employee's complaints "made to supervisors and public officials about sexual harassment and safety at public agencies can be protected citizen speech on matters of public concern"); *Cannell v. Corizon, LLC*, Docket No. 1:14-cv-405-NT, 2015 WL 8664209, at *9 (D. Me. Dec. 11, 2015) (holding that complaints of racially derogatory remarks involve a matter of public concern); *King v. Me. Dep't of Corr.*, No. 1:13–cv–00163–JDL, 2015 WL 2092526, at *5 (D. Me. May 5, 2015) (finding that complaints of sexual orientation discrimination are a matter of public concern). Moreover, the fact that much of the Plaintiff's conduct took place

internally at Brewer High School does not negate the public implications of the speech. *See id.* at *5 n.6 ("[S]tatements made only inside the workplace may support a claim [for First Amendment retaliation] even though they are not shared with the general public.").

The next issue is whether any or all of the Individual Defendants took an adverse employment action against the Plaintiff that was substantially motivated by the Plaintiff's protected activity. Here, I look to the claims asserted against each Individual Defendant:

Gregg Palmer, Cheri Towle, and Renita Ward-Downer: The Plaintiff alleges that Ward-Downer, Superintendent Towle in 2019, and Superintendent Palmer in 2020 each participated in the decisions not to select the Plaintiff as Curriculum Leader because of the Plaintiff's protected speech activities. First Am. Compl. ¶¶ 121, 150. Put another way, the Complaint alleges that Ward-Downer, Towle, and Palmer denied the Plaintiff a benefit in retaliation for her exercise of First Amendment rights. This is precisely the type of adverse conduct that the First Amendment is meant to guard against. *See Barton v. Clancy*, 632 F.3d 9, 23 (1st Cir. 2011) ("As a general matter, the government may not deprive an individual of a 'valuable government benefit' in retaliation for his or her exercise of First Amendment rights.") (quoting *Lynch v. City of Boston*, 180 F.3d 1, 13–14 (1st Cir. 1999)). Furthermore, while there is no direct, smoking-gun evidence of Palmer's, Towle's, or Ward-Downer's unlawful motivations, the Plaintiff's alleged facts do support an inference that the stated reason Pelletier got the job instead of her—Pelletier's superior

communication skills—was disingenuous, given that Pelletier had previously received a poor performance evaluation because of her "communication issues." First Am. Compl. ¶¶ 122–23. At this stage, such evidence suffices to support the Plaintiff's First Amendment retaliation claims against Palmer, Towle, and Ward-Downer.

Brent Slowikowski: Principal Slowikowski was also allegedly involved with the decision not to rehire the Plaintiff as Curriculum Leader, and, for the reasons explained above, the Plaintiff has thus stated a viable First Amendment retaliation claim against him. In addition, however, the Plaintiff alleges that Slowikowski assigned the Plaintiff to a small classroom when she asked to be moved to a different part of the building to prevent interactions with hostile coworkers, even though larger classrooms were available. First Am. Compl. ¶¶ 126–28. I find that this action, too, constitutes an adverse action that can support a First Amendment retaliation claim. *See Lockridge*, 597 F.3d at 472 ("We think that, under certain circumstances, the denial of an employee's request for office space could dissuade a reasonable person from making or supporting a charge of discrimination."). While discovery may shed more light on the motivations for Slowikowski's actions and the effect that they had on the Plaintiff, at this stage I am satisfied that the Plaintiff has stated a viable First Amendment claim against Slowikowski.

Breanne Pelletier and Paul Wellman: Finally, the Plaintiff alleges that Pelletier and Wellman each engaged in hostile behavior aimed at MacDonald. According to the Plaintiff's First Amended Complaint, after MacDonald insisted that the GSA be included in the yearbook, Pelletier began giving MacDonald "dirty looks,"

36

called her a "drama queen," stopped responding to MacDonald's work-related emails, spoke negatively about her to students, and was rude and hostile to her in meetings. First Am. Compl. ¶¶ 47, 57. And, after MacDonald expressed concern about Wellman's treatment of LGBTQ+ students and issues, Wellman joined Pelletier in filing an internal complaint against MacDonald. First Am. Compl. ¶¶ 103–07. I need not address whether these activities constitute adverse actions sufficient to support a First Amendment retaliation claim; as explained below, I find that Pelletier and Wellman are entitled to qualified immunity. *See Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015) (explaining that "courts have the discretion, where warranted, to proceed directly to the second prong" of the qualified immunity analysis without determining whether a constitutional violation necessarily occurred).

### 2. Municipal Liability

As explained above, an official-capacity suit "is tantamount to a suit against the entity of which the official is an agent." *Burrell*, 307 F.3d at 7. Importantly, however, municipal entities "are not vicariously liable under section 1983 for the actions of their non-policymaking employees[; t]hey are responsible only for their own unconstitutional acts." *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011) (internal citation omitted). "Thus, a plaintiff who brings a section 1983 action against a municipality bears the burden of showing that, through its deliberate conduct, the [municipal entity] was the moving force behind the injury alleged." *Id.* (internal quotation marks and emphasis omitted). Such a plaintiff must show that "the entity followed a policy or custom" that was unconstitutional. *Burrell*, 307 F.3d at 7. "When an official policy exists that is unconstitutional on its face, the inquiry is

37

straightforward." *Alston v. Town of Brookline*, 308 F. Supp. 3d 509, 533 (D. Mass. 2018). "A plaintiff can establish the existence of an official policy by showing that the alleged constitutional injury was caused . . . by a person with final policymaking authority." *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008). In the absence of an official policy, "[a] plaintiff may also show an 'unconstitutional municipal custom so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Fincher v. Town of Brookline*, 26 F.4th 479, 485 (1st Cir. 2022) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)).

In this case, the Plaintiff does not specify on what grounds she asserts municipal liability, but there are two potential avenues for such liability evident in her Complaint. The first possibility is that at least some of her injuries were caused by a person or persons with final decision-making authority. For example, it is possible that Palmer and Towle, as superintendents, had final policymaking authority over the Curriculum Leader position, and/or that Slowikowski, as principal, had final policymaking authority over classroom assignments. *See, e.g.*, *Charette v. Me. Sch. Admin. Dist. No. 27*, No. Civ.05-20-B-W, 2005 WL 914763, at *4 (D. Me. Jan. 31, 2005) (recommending denial of motion to dismiss because the plaintiff adequately "allege[d] that it is the [municipal entity's] custom and usage to place final policymaking authority in [the superintendent]—its top administrator—and that it in fact delegated that authority to [the superintendent]"), *R. & R. adopted by* 2005 WL 1126853. *But see, e.g.*, *Craig v. Me. Sch. Admin. Dist. # 5*, 350 F. Supp. 2d 294,

297 & n.2 (D. Me. 2004) (granting motion to dismiss where the plaintiff did not allege that the school board "specifically delegated its policymaking functions to" the superintendent). Defendant Brewer School Department does not address the question of liability based on final policymaking authority, and I therefore leave for another day whether this is a viable theory.

The second possibility is that the Plaintiff's injuries were a result of a widespread custom of constitutional violations among Brewer School Department employees and officials. Defendant Brewer School Department attacks this basis for municipal liability on the ground that the Plaintiff has failed to establish a causal connection between a school policy or custom and the Plaintiff's injuries. Brewer School Dep't's MTD 19. But the facts alleged by the Plaintiff, viewed in the light most favorable to her, do support an inference that there was a widespread practice of hostility and discrimination toward members of the LGBTQ+ community as well as a practice of retaliation against those advocating on behalf of that community. In addition, the Complaint supports a plausible inference—based on the fact, for example, that the Plaintiff repeatedly reported hostile behavior to her superiors— that the Brewer School Department could be said to have actual or constructive knowledge of the culture at the school and yet did little or nothing to end the practice. *See Bordanaro*, 871 F.2d at 1156. Of course, there are facts that may also work against the Plaintiff on this point, such as the fact that the school did eventually hold an LGBTQ+ rights training for staff. At this stage, however, I am satisfied that the

Plaintiff's suit against the Brewer School Department—vis-á-vis her claims against the Official Defendants—should live to see another day.

### 3.   Qualified Immunity

Even if the Plaintiff has adequately alleged the elements of her First Amendment retaliation claim, the Individual Defendants may nonetheless be entitled to qualified immunity. "Qualified immunity shields a public official from suit when he [or she] makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances he [or she] confronted." *Charette v. St. John Valley Soil & Water Conservation Dist.*, 332 F. Supp. 3d 316, 363–64 (D. Me. 2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "Therefore, to determine whether a defendant is entitled to qualified immunity, a court must consider whether the constitutional right the defendant allegedly violated was 'clearly established' at the time of the violation." *Id.* at 364 (quoting *Morales v. Chadbourne*, 793 F.3d 208, 220 (1st Cir. 2015)). "A right is 'clearly established' if 'the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional.' " *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 517 (1st Cir. 2016) (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009)).

In this case, qualified immunity does not protect Defendants Palmer, Towle, Slowikowski, or Ward-Downer from suit on First Amendment grounds because it is clearly established that the First Amendment protects complaints about discrimination, and that retaliation for such speech is unlawful. *See Roy*, 914 F.3d at 73 ("Complaints like Roy's made to supervisors and public officials about sexual

harassment and safety at public agencies can be protected citizen speech on matters of public concern."); *Cannell*, 2015 WL 8664209, at *9 ("Cannell's allegations of daily offensive racially derogatory remarks—made by state employees at a state-operated facility—involve a matter of public concern."); *King*, 2015 WL 2092526, at *5 (finding that complaints of sexual orientation discrimination are protected speech). Moreover, while a recent First Circuit case casts doubt on the denial of qualified immunity where an employee was retaliated against for purely *internal* complaints of discrimination, *see Roy*, 914 F.3d at 73, in this case the Plaintiff's complaints were made internally *and* externally—both to various school officials and to the relevant state agency.

I find, however, that Defendants Wellman and Pelletier are entitled to qualified immunity. It is true that "even 'relatively minor events' can give rise to liability for retaliation under § 1983" and that "a campaign of harassment can support a First Amendment retaliation claim if the harassment would deter a reasonably hardy individual in the exercise of his or her First Amendment rights." *Barton*, 632 F.3d at 30 (internal citation omitted). But qualified immunity is still appropriate where a defendant lacks "fair warning that his particular conduct was unconstitutional." *Id.* (quoting *Maldonado*, 568 F.3d at 269). In this case, Wellman and Pelletier are alleged to have made rude and offensive comments to MacDonald and to have jointly filed an internal complaint against her, based largely, it seems, on their annoyance with MacDonald's advocacy for LGBTQ+ students and rights. That said, it is not clear that a reasonable official in Wellman's or Pelletier's shoes

41

would have understood that his or her conduct would deter a reasonably hardy individual in the exercise of her rights. Counts VIII and IX, asserting First Amendment claims against Wellman and Pelletier, are therefore dismissed.

### B.    Equal Protection

The Fourteenth Amendment provides that no State shall "deny to any person . . . the equal protection of the laws." U.S. Const. amend. XIV. To state a claim for a violation of her rights under the Equal Protection Clause, a plaintiff must allege that (1) she "was treated differently than others similarly situated," and (2) "such difference was based on an impermissible consideration, such as race." *Ayala-Sepúlveda v. Mun. of San Germán*, 671 F.3d 24, 32 (1st Cir. 2012) (quoting *Lopera v. Town of Coventry*, 640 F.3d 388, 402 (1st Cir. 2011)). "Some evidence of actual disparate treatment is a threshold requirement of a valid equal protection claim." *Id.* (internal quotation marks omitted).

In this case, the Plaintiff asserts that Defendant Brewer School Department and each of the Individual Defendants violated her rights to equal protection by "discriminating against MacDonald because of sex, failing to stop the retaliation against MacDonald for complaining about sex discrimination, and by [themselves] retaliating against MacDonald for complaining about sex discrimination." First Am. Compl. ¶¶ 193, 195, 197, 199, 201, 203. The Defendants seek dismissal of the Plaintiff's equal protection claims on the ground that she has failed to allege facts that establish the threshold requirement of actual disparate treatment. *See* Brewer School Dep't's MTD 20; Individual Defs.' MTD 8.

42

The Plaintiff's Complaint, however, alleges two incidents that support her equal protection claim. First, the Plaintiff alleges that Pelletier was chosen over MacDonald for the Curriculum Leader position, even though the Plaintiff had held that position for years (with consistently strong performance evaluations) and Pelletier had received a poor performance review for communication issues. First Am. Compl. ¶¶ 42, 120, 123, 148–49. Second, the Plaintiff alleges that she was subjected to an internal investigation and labeled "unprofessional" because of her LGBTQ+ advocacy and association with LGBTQ+ individuals. First Am. Compl. ¶¶ 103–11, 129–30, 166. Viewed in the light most favorable to the Plaintiff, I find that these allegations suffice to establish that she was denied a job, subjected to special scrutiny, and ultimately treated differently than others similarly situated because of her association with and advocacy for LGBTQ+ individuals.

## CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Defendants' motions to dismiss. Defendant Brewer School Department's motion is **GRANTED IN PART** as to Count II, insofar as that count asserts a claim under 42 U.S.C. § 2000e-2(a). The remaining claims asserted in Count II survive. The Individual Defendants' motion is **GRANTED** as to Counts VIII and IX. Both motions are **DENIED** as to all other counts.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 12th day of January, 2023.